# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2778

_____

| | | |
|---|---|---|
| Stephen Cordry, doing business as Cordry Mobile Homes, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Vanderbilt Mortgage & Finance, Inc., | * | |
| | * | |
| | * | |
| Appellee. | * | Appeal from the United States |
| _____ | * | District Court for the Western |
| | * | District of Missouri. |
| 21st Mortgage Corporation, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Stephen Cordry, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 13, 2006
Filed: April 28, 2006

_____

Before COLLOTON, HEANEY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Stephen Cordry appeals the order of the district court[1] granting summary judgment to defendant Vanderbilt Mortgage and Finance ("Vanderbilt") on all of Cordry's claims and Vanderbilt's counterclaim.[2] For the reasons discussed below, we affirm the judgment of the district court.

## I.    BACKGROUND

Cordry has operated mobile home retail sales lots since 1987. Such retail sales lots rely on "floor-plan financing," in which a finance company lends a certain percentage of a mobile home's value to enable the retailer to purchase and place the home on its lot. The finance company retains a security interest in the financed homes. The retailer pays back the finance company with interest when the home is sold to a customer. The finance company conducts a risk analysis to determine what percentage of a home's value it is willing to loan, based on the age and condition of the home, the dealer's circumstances and other variables.

In November 2001, Cordry executed a floor-plan financing agreement, supplemented by an addendum, with Deutsche Financial Services ("DFS"). The financing agreement established a $925,000 revolving credit line for new mobile homes and a $75,000 revolving credit line for used homes. Paragraph 1.2 of the addendum set the terms for used home financing:

---

[1]The Honorable John T. Maughmer, Chief Magistrate Judge for the Western District of Missouri, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

[2]Vanderbilt's counterclaim interest was subsequently assigned to 21st Mortgage Corporation, and 21st Mortgage was substituted as plaintiff on the counterclaim. Following the convention of the parties, we continue to refer to the claim as "Vanderbilt's counterclaim."

DFS, in its sole discretion, may loan to [Cordry] an amount up to: (a) Sixty-Five percent (65%) of the Base NADA wholesale value . . . of Used Manufactured Homes which are no more than five (5) model years old . . . ; and (b) Sixty percent (60%) of the Base NADA wholesale value . . . of Used Manufactured Homes which are between six (6) and ten (10) model years old . . . .

The parties agree that the term "Base NADA wholesale value" refers to a value for each manufactured home as set by the NADA Manufactured Housing Appraisal Guide, which is analogous to the Kelley Blue Book for automobiles. However, the parties disagree as to which NADA value applies, wholesale or retail. The NADA guide lists retail values for mobile homes and provides formulae for reducing those retail values to wholesale values. Despite the statement in ¶ 1.2 that DFS would loan up to 60 or 65 percent of the NADA *wholesale* value, the DFS employees who dealt with Cordry's financing requests for used mobile homes actually loaned Cordry 60 or 65 percent of the listed *retail* NADA value. Those employees testified that they were not aware of the NADA provisions and formulae for reducing retail to wholesale value.

In November 2002, after a series of assignments by DFS, Cordry executed a Letter of Direction drafted by Vanderbilt authorizing an assignment of DFS's duties under the agreement to Vanderbilt. The letter stated:

[Cordry] is giving this authorization based on Vanderbilt's assurance that Vanderbilt will continue to extend a credit facility to [Cordry] under the same credit line which DFS has provided to [Cordry], and the same terms and conditions of the dealer agreements originally between DFS and [Cordry] (as long as [Cordry] is in compliance with all terms and conditions).

After the assignment, Vanderbilt continued to finance new mobile homes to Cordry's satisfaction. Trouble arose when Cordry expected financing on four used

homes in the amount of $39,500, based on the percentage of NADA retail value he was accustomed to receiving from DFS. Instead, Vanderbilt offered to finance three of the used homes for a total of $12,500, calculated as a percentage of the NADA wholesale value. According to Cordry, this figure represented about 35 percent of the listed NADA retail value of the homes.

Cordry brought this diversity action against Vanderbilt for breach of ¶ 1.2 of the addendum, breach of the implied covenant of good faith and fair dealing, fraudulent or negligent misrepresentation in the Letter of Direction and tortious interference with a business expectancy.[3] Cordry argued that the denial of the $75,000 revolving credit line for used homes at 60 or 65 percent of NADA retail value forced him to close a recently opened retail sales lot, proximately resulting in over $1 million in damages. Vanderbilt counterclaimed for amounts Cordry failed to repay upon the sale of new homes financed by Vanderbilt. On competing motions for summary judgment, the district court granted summary judgment to Vanderbilt on all claims, finding Vanderbilt neither breached the express or implied terms of the financing agreement nor made false statements in the Letter of Direction. Cordry appeals.

## II.    DISCUSSION

"We review a grant of summary judgment *de novo* and apply the same standards as the district court." *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005). "Summary judgment is warranted if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Id.* The parties agree that Missouri contract law applies in this diversity action. *See Mountain Pure, LLC v. Turner Holdings, LLC*, 439 F.3d 920, 923 (8th Cir. 2006).

---

[3]On appeal, Cordry abandons his tortious interference claim.

-4-

## A. Breach of ¶ 1.2 of the Addendum

Cordry devotes much of his argument to the meaning of the contract term "Base NADA wholesale value." No matter how that term is defined, however, Vanderbilt did not breach ¶ 1.2 of the addendum by lending less than the full 60 or 65 percent of NADA value on the used homes. "Parties are generally free to contract as they wish, and courts will enforce contracts according to their plain meaning, unless induced by fraud, duress, or undue influence." *Util. Serv. & Maint., Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 913 (Mo. banc 2005). The express terms in ¶ 1.2 of the addendum were that "DFS, in its sole discretion, may loan to [Cordry] an amount *up to*" 60 or 65 percent of the Base NADA wholesale value. (Emphasis added). By its plain language, the addendum provided the finance company discretion to lend less than 60 or 65 percent of the NADA value on any given used home.

Cordry suggests that Vanderbilt's discretion under ¶ 1.2 of the addendum to lend any amount less than 60 or 65 percent for any used home, including lending nothing if it chooses, renders the contract illusory. "The phrase 'illusory promise' means 'words in promissory form that promise nothing.' An illusory promise is not a promise at all and cannot act as consideration; therefore no contract is formed." *Magruder Quarry & Co. v. Briscoe*, 83 S.W.3d 647, 650 (Mo. Ct. App. 2002) (quoting Corbin on Contracts § 5.28). However, it is well-settled that "an implied obligation to use good faith is enough to avoid finding a contract null and void due to an illusory promise." *Id.* at 650-51. For example, *Magruder Quarry* held that a quarry lease was not void as illusory, even though the lessees had the discretion not to mine any rock at all, because the lessees were under an implied covenant of good faith and fair dealing to use reasonable efforts to mine rock. *Id.* at 650-52. Similarly, in the instant case Vanderbilt was bound by the implied covenant of good faith and fair dealing to use reasonable efforts to finance used homes for Cordry, as the covenant is implied in all contracts in Missouri. *Id.* at 651. Therefore, the discretion granted by ¶ 1.2 does not render the agreement illusory.

Cordry next argues that DFS's practice of lending the full 60 or 65 percent of the NADA retail value for each used home it financed became part of the financing agreement and bound Vanderbilt to lend that amount after the assignment. First, Cordry asserts that the individual Statements of Transaction for each used mobile home financed by DFS must be read as part of the financing agreement assigned to Vanderbilt. The Statements of Transaction are described in ¶ 2 of the financing agreement:

> [Cordry] and DFS agree that certain financial terms of any advance made by DFS under this Agreement . . . are not set forth herein because such terms depend, in part, upon the availability of Vendor discounts, payment terms or other incentives, prevailing economic conditions, DFS' floorplanning volume with [Cordry] and with [Cordry's] Vendors, and other economic factors which may vary over time. [Cordry] and DFS further agree that it is therefore in their mutual best interest to set forth in this Agreement only the general terms of [Cordry's] financing arrangement with DFS. Upon agreeing to finance a particular item of inventory for [Cordry], DFS will send [Cordry] a Statement of Transaction identifying such inventory and the applicable financial terms.

This contractual language demonstrates that the parties did not intend the agreed financing levels for individual mobile homes, as set forth in each Statement of Transaction, to bind the finance company to offer, or the retailer to accept, the same financing level for future individual mobile homes. Furthermore, although ¶ 1.2 of the addendum adds some specificity to the financing terms for used mobile homes, ¶ 1.3 of the addendum reiterates that "[a]pplicable financial terms . . . will be set forth on the Statement of Transaction" and ¶ 2 of the addendum states that the addendum modifies no other terms of the agreement. The only reasonable conclusion is that, under ¶ 2 of the financing agreement, the Statements of Transaction memorializing DFS's decision to lend the full 60 or 65 percent of the NADA retail value for the used homes it already had financed would not have bound DFS to continue to lend the same

-6-

amount for future used homes. Consequently, Vanderbilt, which steps into the shoes of DFS as an assignee, also cannot be so bound. *See Carlund Corp. v. Crown Ctr. Redev.*, 849 S.W.2d 647, 651 (Mo. Ct. App. 1993).

Similarly, Cordry argues that DFS's practice of lending the full 60 or 65 percent of the NADA retail value for each used home it financed is a "course of dealing" that modified the agreement and bound Vanderbilt after the assignment. This argument also fails. Paragraph 25 of the financing agreement expressly states that the terms of the agreement cannot be modified by any non-compliant course of dealing between the parties. Under Missouri law, a written agreement cannot be modified by the later conduct of the parties unless the evidence shows mutual assent and additional consideration for the modification.[4] *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 901-02 (Mo. banc 1990). Cordry presents no evidence that he provided consideration to DFS or Vanderbilt in return for a relinquishment of their discretion to lend less than 60 or 65 percent. We conclude that the course of dealing between DFS and Cordry did not alter the terms of the agreement.

### B.     Misrepresentation in the Letter of Direction

Cordry argues that Vanderbilt made a fraudulent or negligent misrepresentation in the Letter of Direction by promising to honor "the same terms and conditions of the dealer agreements originally between DFS and [Cordry]." In particular, Cordry argues that this statement was made fraudulently or negligently because Vanderbilt always intended to use its own risk-evaluation program and spreadsheets, rather than DFS's risk-evaluation program and spreadsheets, to determine finance levels for Cordry's used manufactured homes.

---

[4]This rule would not apply to a sale of goods under the Uniform Commercial Code, provided that sufficient evidence established the alleged course of conduct. *See, e.g.*, *School Dist. v. Transamerica Ins. Co.*, 633 S.W.2d 238, 247 (Mo. Ct. App. 1982). However, the instant case involves a finance agreement, not a sale of goods.

The elements of fraudulent misrepresentation under Missouri law are: (1) the representation is false; (2) the representation is material; (3) the speaker knows of the representation's falsity; (4) the speaker intends the hearer to act on the representation "in the manner reasonably contemplated"; (5) the hearer is ignorant of the representation's falsity; (6) the hearer relies on the representation's truth; (7) the hearer has a right to rely on the representation; and (8) the hearer is consequently and proximately injured. *Joel Bianco Kawasaki Plus, Inc. v. Meramec Valley Bank*, 81 S.W.3d 528, 536 (Mo. banc 2002). Negligent misrepresentation differs primarily in that the speaker must only fail "to exercise reasonable care or competence in obtaining or communicating th[e] information," rather than know of its falsity. *M & H Enters. v. Tri-State Delta Chems., Inc.*, 35 S.W.3d 899, 904 (Mo. Ct. App. 2001).

Vanderbilt represented that it would honor the terms and conditions of the "dealer agreements originally between DFS and [Cordry]." The dealer agreements originally between DFS and Cordry were the financing agreement and addendum. To show that Vanderbilt's intention to use its own risk-evaluation program and spreadsheets rendered the representation false, Cordry must show that the terms and conditions of the financing agreement and addendum bound the finance company to use a particular risk-evaluation program and spreadsheets. The record indicates that a finance company uses its risk-evaluation program and spreadsheets to determine an appropriate financing level based on the details of the mobile home to be financed, the retailer's circumstances and other variables. As discussed above, ¶ 2 of the financing agreement carefully excludes from the agreement any binding constraints on how such variables are to be used to determine a finance level for each mobile home. The only reasonable conclusion is that the parties did not intend to require the finance company to use a particular risk-evaluation program and spreadsheets throughout the duration of the agreement. Therefore, Vanderbilt's intention to use its own program and spreadsheets does not render false its promise to honor the terms of the dealer agreements, and Cordry's misrepresentation claims must fail.

## C.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Cordry contends that Vanderbilt breached the implied covenant of good faith and fair dealing by exercising its discretion under ¶ 1.2 of the addendum to lend less than the full 60 or 65 percent.  "Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Elec. Coop., Inc. v. Missouri Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998).  A breach of the covenant of good faith and fair dealing occurs where one party "exercise[s] a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract." *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 46 (Mo. Ct. App. 2002).  "When a decision is left to the discretion of one party, the question is not whether the party made an erroneous decision but whether the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion." *Id.* at 48.  In other words, there is no breach if the party exercised its discretion based on good-faith business judgment. *See id.* at 48-49.

In the instant case, Cordry presents no evidence that Vanderbilt was using anything other than its good-faith business judgment when it calculated a financing level for the used homes presented by Cordry.  Indeed, Cordry's complaint is that the business program used by Vanderbilt to evaluate financing levels is not as favorable to Cordry as the business program previously used by DFS.  This evidence does not support a finding of bad faith or arbitrariness by Vanderbilt.  Therefore, we find no breach of the implied covenant of good faith and fair dealing.[5]

---

[5]Cordry also contends that Vanderbilt breached the implied covenant of good faith and fair dealing by failing to use diligence to determine the prior course of dealing between DFS and Cordry before accepting the assignment of the financing agreement.  However, as discussed previously, ¶ 2 and ¶ 25 of the financing agreement make clear that the details of previous financing transactions between the parties would not affect the terms of the agreement.  Thus, an assignee would have no

**D.** **Vanderbilt's Counterclaim**

Vanderbilt seeks payment for amounts Cordry failed to repay upon his sale of eight new homes financed by Vanderbilt. Cordry withheld payment under the "first to breach" rule. The "first to breach" rule holds that "a party to a contract cannot claim its benefit where he is the first to violate it." *Classic Kitchens & Interiors v. Johnson*, 110 S.W.3d 412, 417 (Mo. Ct. App. 2003) (quotations omitted). Because we find that Vanderbilt did not breach the agreement, Cordry has no defense to the counterclaim. The district court did not err in granting summary judgment to Vanderbilt on this claim.

## III. CONCLUSION

We conclude that the district court did not err in granting summary judgment to Vanderbilt on all of Cordry's claims and Vanderbilt's counterclaim. Therefore, we affirm the judgment of the district court.

_____

reason to make a detailed inquiry into the matter.