**Mary Kay MORROW, Appellant,**

v.

**HALLMARK CARDS, INC.,
Respondent.**

**No. WD 67440.**

Missouri Court of Appeals,
Western District.

June 30, 2008.

Application for Transfer to Supreme Court
Denied Sept. 2, 2008.

Application for Transfer
Denied Nov. 6, 2008.

Mark A. Jess, Kansas City, MO, for appellant.

Jeffrey D. Hanslick, Kansas City, MO, for respondent.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN, PAUL M. SPINDEN, JAMES M. SMART, JR., JOSEPH M. ELLIS, RONALD R. HOLLIGER, JAMES E. WELSH, JOSEPH P. DANDURAND, and ALOK AHUJA, JJ.

JAMES M. SMART, JR., Judge.

This case addresses the issue of whether a program adopted by Hallmark Cards, Inc., requiring employees to give up their right of access to the courts for employment-related claims, and providing arbitration as the exclusive means of resolution of those claims, is a legally enforceable contract. Mary Kay Morrow, a former employee of Hallmark, contends that the circuit court erred in finding an enforceable contract and in compelling arbitration as to her claims of age discrimination and retaliation.

■ Because arbitration can be compelled only when a party has agreed to arbitrate claims, *Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 435 (Mo. banc 2003), the threshold issue is whether there is a legally enforceable contract to arbitrate. Although Hallmark refers to its arbitration program as a "contract," the program does not involve mutual promises because Hallmark reserves the right, in its sole discretion, to modify or revoke the provisions of the program.

There also is no other legal consideration provided to Hallmark's employees for unilaterally giving up their right of access to the courts. This is because, contrary to Hallmark's argument, "continued employment" in the at-will employment relationship does not constitute legal consideration. Ms. Morrow, as a former employee of Hallmark, now has no contractual duty to arbitrate her claims.

We reverse the rulings compelling and confirming arbitration, and remand to the trial court for further proceedings.

## I. Background

Mary Kay Morrow was hired by Hallmark in 1982. At the start of 2002, while Morrow was working as an associate product manager, Hallmark adopted, effective January 5, 2002, a policy applicable to its employees called the "Hallmark Dispute Resolution Program" ("DRP" or "the program"). This policy provided that if an employee continued to work for Hallmark after the policy became effective, the employee would thereby be deemed to have agreed to submit to the company's procedures for resolving claims against the company, which included binding arbitration in lieu of litigation. Morrow received a copy of the policy. Morrow continued working for Hallmark through and after the effective date of January 5, 2002.

Fifteen months later, on April 8, 2003, Hallmark terminated Morrow's employment. Morrow claims that Hallmark discriminated against her because of her age and retaliated against her for complaining about Hallmark policies. Hallmark's position is that Morrow was terminated for poor work performance after failed attempts to improve her performance through coaching and a performance improvement plan.

Morrow contends arbitration could not be compelled in this case. For the reasons set forth below, we agree.

## II. The Dispute Resolution Program

The DRP process is divided into four levels. Level One, the "Open Door Process," and Level Two, "Final Internal Review," are informal procedures for addressing the employee's complaint. In Final Internal Review, management provides the employee with a written response to the employee's concern.

If Final Internal Review does not resolve the dispute, the employee may submit a "covered claim" to Level Three, "Nonbinding Mediation." An independent, neutral mediator will attempt to help the employee and Hallmark resolve the dispute. If mediation is unsuccessful, the employee may submit the claim to Level Four, "Binding Arbitration." The employee also has the option of skipping Level Three and going straight to Level Four. The employee has thirty calendar days to initiate arbitration after the Final Internal Review, or, if there is a mediation effort, within thirty days after the mediation ceases without a resolution.

At Level Four, an independent, neutral arbitrator will determine the merits of the employee's claim. The arbitrator may decide various matters related to procedure as well as the merits of the claims themselves. The arbitrator's decision under the DRP is final and binding on the parties, subject to court review of the arbitrator's award. The arbitrator is chosen jointly by the employee and Hallmark from arbitrators recognized by the American Arbitration Association (AAA). Hallmark pays the filing fee and other administrative fees of the AAA and all the costs of the arbitrator's fees and travel expenses, except for the sum of $100, which is paid by the employee when initiating arbitration. The program provides that the arbitration proceedings and the results thereof, including the arbitration award, are to remain confidential.

Any employment-related dispute may be submitted to Levels One and Two, but only "covered claims" may be processed at Levels Three and Four. The "covered claims" are "employment-related claims [other than workers' compensation and unemployment compensation claims] against the

company and individual managers acting within the scope of their employment...." Such covered claims include, *inter alia,* statutory claims of discrimination, harassment, and retaliation; Family and Medical Leave Act claims; tort claims; and claims asserting a violation of public policy.

The "excluded claims" include claims related to an alleged breach of an employee's noncompetition, nonsolicitation, fiduciary, or confidentiality obligations; claims involving patents, trademarks or intellectual property; and claims not raised in a timely manner under the DRP procedures or other applicable time limitations, including statutes of limitation.[1]

The DRP states that nothing in the program is intended "to discourage or interfere with the legally protected rights of employees to file administrative claims or charges with government agencies." Hallmark concedes that this means that employees may file claims with the Missouri Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC) and await a response from the agency before being required to comply with the program deadline for invoking arbitration.

■ When the parties have entered into a contract to arbitrate, the Federal Arbitration Act (FAA), 9 U.S.C. sections 1–16, is applicable generally when there is an arbitration contract affecting interstate commerce. *See Triarch Indus., Inc. v. Crabtree,* 158 S.W.3d 772, 774 n. 1 (Mo. banc 2005); *Mueller v. Hopkins & Howard, P.C.,* 5 S.W.3d 182, 185 (Mo.App.1999) (both citing 9 U.S.C. section 2).

Under Hallmark's DRP, the arbitrator has broad authority to decide all "covered claims" in accordance with the applicable substantive law. The arbitrator has no authority to change company policies, procedures, rules, or practices. Otherwise, the program states that the arbitrator may grant any remedy or relief that would have been available in court, which would include equitable relief and attorney's fees when allowed by law. The arbitrator also has broad authority to make rulings on discovery issues and other procedural matters. The arbitrator may issue subpoenas for witnesses and documents. The arbitrator must enter findings of fact and conclusions of law. The Hallmark program differs from common arbitration procedures in that the program purports to provide for judicial review of errors of law, rather than merely for the narrower statutory grounds set out in 9 U.S.C. sections 10 and 11 (1994).[2]

### III. Procedural History

Shortly after Morrow's employment was terminated, she proceeded unsuccessfully through Level Three and also concurrently filed a charge of discrimination under the Missouri Human Rights Act (MHRA) with

---

1. Morrow contends that because Hallmark took the position that her claims were not timely made under the arbitration portion of the DRP, her claims are "excluded" claims and, therefore, arbitration cannot be compelled. We do not believe that argument expresses a reasonable interpretation of the DRP. Otherwise, an employee could easily defeat mandatory arbitration and go directly to litigation by simply delaying the invocation of arbitration. Clearly, the overall intent of Hallmark was to make arbitration an exclusive remedy. We will not adopt an interpretation of the program that clearly was not intended. *See Dunn Indus. Group,* 112 S.W.3d at 428.

2. The DRP's purported scope of judicial review must be considered in the light of the recent decision of the U.S. Supreme Court in *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* —— U.S. ——, ——, 128 S.Ct. 1396, 1400, 170 L.Ed.2d 254 (2008) (rejecting expanded judicial review beyond that provided in the FAA, though the parties have agreed to such expansion).

the Missouri Human Rights Commission (MHRC). On November 26, 2003, the MHRC issued Morrow a "right to sue" letter, notifying her that she had ninety days from the date of the letter to sue Hallmark or her right to sue would be lost.

Morrow filed a petition in the Circuit Court of Jackson County against Hallmark, alleging age discrimination and retaliation. Hallmark filed a motion to stay the litigation and compel arbitration. The court granted Hallmark's motion to stay litigation and compel arbitration. After two unsuccessful attempts to obtain writs to compel the circuit court to hear the matter, Morrow ultimately invoked arbitration approximately eight months after arbitration had been compelled.

The arbitrator ruled that the DRP constituted a valid contract and was not unconscionable. The arbitrator dismissed Morrow's claims for lack of timeliness in invoking arbitration.

The trial court entered its judgment denying Morrow's motion to vacate. Morrow now appeals to this court.

## IV. Standard of Review

Morrow does not appeal the conclusions of law of the arbitrator. However, the circuit court rulings (which she does appeal) overlap the arbitrator rulings. All of Morrow's points involve the issue of whether Hallmark's program is an enforceable contract and, therefore, whether the motion to compel arbitration was properly granted and the award was properly upheld.

 The question of whether or not arbitration can properly be compelled is a question of law, which we review *de novo*. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 856 (Mo. banc 2006). Missouri substantive law governs the issues of the existence, validity, and enforceability of

any purported arbitration contract. *See id.*; 9 U.S.C. sec. 2. "[I]n determining whether the parties have entered into a valid agreement to arbitrate, the usual rules of state contract law and canons of contract interpretation apply." *Triarch Indus.*, 158 S.W.3d at 776.

Morrow contends that the purported agreement is invalid because the program fails to include a clear waiver of the right to jury trial as to her claims. She also contends that the "contract" was illusory and that, if this program constitutes a contract, it is unconscionable. We must determine whether the circuit court incorrectly declared the law or misapplied the law in compelling arbitration. *See Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

## V. Arbitration Cannot Be Compelled in the Absence of a Contract

 As we noted at the outset, "[a]rbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate." *Dunn Indus. Group*, 112 S.W.3d at 435; *see also* 6 C.J.S. *Arbitration* sec. 1 (2004). Absent a contract to arbitrate, no party has a unilateral right to impose on another party a requirement of arbitration as the sole procedure for dispute resolution. *Dunn Indus. Group*, 112 S.W.3d at 427–28; *see, e.g., Bailey v. Fed. Nat'l Mortgage Ass'n*, 209 F.3d 740, 745 (D.C.Cir.2000). It is a firmly established principle that parties can be compelled to arbitrate against their will only pursuant to an agreement whereby they have *agreed* to arbitrate claims. *AT & T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1200 (9th Cir.2002); *Bailey*, 209 F.3d at 745. Hallmark does not challenge the existence

or the firmness of this doctrine; Hallmark simply insists there is a contract here between the employer and the employees.

There is nothing that would preclude the possibility of an employer and its employees from entering into an enforceable agreement to arbitrate claims, including statutory claims. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the watershed case on the issue of the arbitrability of statutory employment claims, the employer and the employee had both executed agreements required by the New York Stock Exchange agreeing that all employment disputes were to be arbitrated. The U.S. Supreme Court affirmed a decision enforcing the arbitration agreement, rejecting a contention that arbitration of an age discrimination claim was inherently antagonistic to the public purposes of the Age Discrimination in Employment Act (ADEA). *Id.* at 27–35, 111 S.Ct. 1647. Thus, *Gilmer* declared that a contract to arbitrate employment discrimination claims is not inherently contrary to public policy. *Id.; see also Boogher v. Stifel Nicolaus & Co.*, 825 S.W.2d 27, 29 (Mo.App.1992).

Since the 1991 decision in *Gilmer*, the courts have taken different approaches to employer-imposed arbitration plans, with some courts enforcing the plans, while others have found them unenforceable for various reasons. *See, e.g., Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir.2005) (enforceable); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126 (7th Cir.1997) (unenforceable); *see also* Steven S. Poindexter, Note, *Pre-Dispute Mandatory Arbitration Agreement and Title VII*, 2003 J. Disp. Resol. 301 (2003).

The Court in *Gilmer* did not address the issue that we view as the key issue in the matter before us: whether under Missouri law there can be a legal contract between employer and employee to arbitrate claims when the employer imposes a one-sided mandatory arbitration requirement (meaning that only one party is required to submit all claims to binding arbitration) on an existing at-will employment relationship.

## VI. The DRP: A Legally Enforceable Contract?

Morrow challenges the determination of the trial court that the DRP is a contract enforceable at law. She contends, *inter alia*, that the notion that the DRP is a contract is an illusion.

■ Contracts embody the intention of two or more parties to bind themselves legally to promises, and are often characterized by the concepts of mutual promises. Sometimes, in lieu of mutual promises, a non-promising party may provide legal consideration, that is, the transfer of something of value to the promising party. *See Triarch Indus.*, 158 S.W.3d at 775. Many courts have invalidated purported contracts containing "non-mutual arbitration provisions" (requiring only the party with less economic bargaining power to submit claims to arbitration) because they are so "one-sided" as to be illusory or unconscionable. *Id.* at 774–75.

Hallmark informed its employees that by continuing to work after notice of the DRP, they would be deemed to have consented to its terms. Hallmark acknowledges that the DRP was presented as a new term or condition of employment. Employees are typically not asked or required to sign a document indicating agreement with new terms of employment. If employees do not agree with a new term of employment, they may leave.

■ With regard to contracts, on the other hand, signatures remain a com-

mon, though not exclusive, method of demonstrating agreement. *See, e.g., Bailey*, 209 F.3d at 745 (noting that the employee never signed an agreement to arbitrate and expressed disagreement with the plan); *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 682 (8th Cir.2001) (employee demonstrated her intent to arbitrate by signing agreement); *McIntosh v. Tenet Health Sys. Hosp., Inc.*, 48 S.W.3d 85, 89 (Mo.App.2001) (noting that employee signed arbitration clause agreeing, along with company, to submit claims to arbitration). In *Gilmer*, 500 U.S. at 23, 111 S.Ct. 1647, both employer and employee signed the agreement required by the NYSE. Here, in contrast, the employee was not expected to express agreement, but was expected simply to acquiesce in the new requirement in order to keep working.[3] As will be shown in the discussion below, the distinction between terms and conditions of employment, on the one hand, and legally enforceable contracts, on the other, is crucial for this case.

### The Significance of the "Non–Mutual" Nature of the Requirement that Only the Employee Must Submit Claims

Along with the fact that the DRP was *presented* only as a term and condition of employment, we note that the *structure* of the DRP makes it look like a mere term of employment and not an enforceable con-

tract. The DRP is not a traditional bilateral pre-dispute arbitration contract with each party promising to submit to arbitration any claims that might arise out of the employment relationship. The only "covered claims" are employment-related claims against the company. Thus, the arbitration program is "non-mutual." *See Triarch Indus. v. Crabtree*, 158 S.W.3d at 775; *see also Ting v. AT & T*, 319 F.3d 1126, 1149–51 (9th Cir.2003). If Hallmark wishes to sue any employee for any reason, it can do so without having to arbitrate.

While the Missouri courts have forced employees to arbitrate claims, no cases have involved a purported "contract" like this one. For instance, in *McIntosh*, 48 S.W.3d at 89, the court dealt with the enforceability of an agreement between an employer and a former employee in which *both* parties agreed to "submit all claims and disputes it may have with [the other party] to arbitration." *See also Mueller*, 5 S.W.3d 182 (formal, written employment agreement with a specified duration; promises by *both* parties to arbitrate); *Boogher*, 825 S.W.2d 27 (like *Gilmer*, apparently involved the securities industry's typical bilateral agreement); *Lyster v. Ryan's Family Steak Houses*, 239 F.3d 943 (8th Cir.2001) (Missouri law) (mutual promises to submit claims to arbitration).[4]

---

**3.** Contrary to Hallmark's contention, Morrow's participation in Levels One–Three in an effort to resolve her dispute is not consent to Level Four; Levels One–Three are a positive benefit to the employees, and do not require giving up any rights. Moreover, the courts *favor* the efforts of any party to try to resolve claims informally, free of accusations of estoppel or waiver. *Cf. State ex rel. State Highway Comm'n v. Sheets*, 483 S.W.2d 783, 785 (Mo.App.1972) ("Public policy favors the settlement of disputed claims out of court and offers of settlement are treated as offers to obtain peace rather than an admission of value to be held against the offerer."); *Jacore*

*Sys., Inc. v. Cent. Mut. Ins. Co.*, 194 Ga.App. 512, 390 S.E.2d 876, 879 (1990) (Because the law favors the settlement of claims without litigation, court should not favor rules that penalize parties by finding waiver or estoppel of a party's rights.). Her participation in Levels One–Three was nothing other than an attempt to resolve her claims informally.

**4.** *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir.1997) (purporting to apply Missouri law), does not support Hallmark's position because the court's opinion did not specify whether the Tenet Healthcare program provided for mutual commitments to submit

This does not necessarily mean that there could be no enforceable contract to arbitrate claims when the contract does not involve mutual promises to submit claims to arbitration. Certainly, a one-sided covenant to arbitrate *can* be created when there is an enforceable underlying contract, of which an arbitration clause is a part, or when there is an evident reason for a one-sided contract, such as when the parties have identified a specific dispute that has already arisen, and when there are no further claims or counterclaims that might also need resolution, or when there is specific consideration for the imbalance, such as the favorableness of the terms of an enforceable underlying contract or otherwise-related contract. *See Schneider,* 194 S.W.3d at 861. However, the lack of mutual promises to submit claims must be considered in determining whether there is an enforceable agreement, particularly if it is adhesive in nature. *Triarch Indus.,* 158 S.W.3d at 775 (court expressing doubt as to the enforceability of such a purported agreement, but finding it unnecessary to decide the issue in context); *see also* 1 JAY E. GRENIG, ALTERNATIVE DISPUTE RESOLUTION, section 6:49, p. 141 (3d ed.2005).[5]

As noted in *Triarch,* 158 S.W.3d at 775, courts in other states and circuits have found similar one-sided, employer-mandated policies of mandatory arbitration to lack the requisites of an enforceable contract where the arbitration requirement was simply imposed on at-will employees as a condition of employment. *See, e.g., Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126 (7th Cir.1997) (employer required employee to arbitrate, but employer did not agree to submit its claims to arbitration); *Salazar v. Citadel Commc'ns Corp.,* 135 N.M. 447, 90 P.3d 466 (2004) (employee supposedly obligated to arbitrate, but employer not obligated to do so; arbitration agreement held illusory); *Dumais v. Am. Golf Corp.,* 299 F.3d 1216 (10th Cir.2002) (the "We Can Work It Out" agreement required the employee to arbitrate, but left the employer free to revoke or alter the arbitration plan; held not enforceable arbitration contract).[6]

## Hallmark's Purported Promises

When an employer unilaterally imposes a requirement on employees, one might look to see if the employer has also promised anything, if the requirement is purported to be a "contract." When a contract is not bilateral (when promises do not flow both ways), there must be good

---

claims. Tenet Healthcare's arbitration program reflected in other cases involved a mutual obligation to submit claims to arbitration. *See, e.g., McIntosh,* 48 S.W.3d at 89; *Ex parte Ephraim,* 806 So.2d 352 (Ala.2001) (both also involving Tenet Healthcare).

5. Hallmark does not purport to expressly justify its exempting itself from arbitrating its claims. Businesses may tend to like the fact that the courthouse is "always open," while an arbitration forum is open only when convened. One would suppose, however, that an arbitration agreement could authorize emergency applications to a court by either party for temporary equitable relief, with any such temporary order subject to ultimate resolution through the arbitration program. For some of Hallmark's potential claims, such as intellectual property claims, arbitration might be considered a useful method of dispute resolution. *See* 1 GRENIG, *supra,* section 18:20, p. 441.

6. There are cases supporting Hallmark's view. *See, e.g., Barker v. Golf U.S.A., Inc.,* 154 F.3d 788 (8th Cir.1998) (applying Oklahoma law); *Caley,* 428 F.3d 1359 (Georgia law) (upholding program quite similar to Hallmark's DRP); *Raasch v. NCR Corp.,* 254 F.Supp.2d 847 (S.D.Ohio 2003). But in these cases, the courts generally, we submit, fail to see that at-will employment does not provide legal consideration. *See, e.g., Raasch,* 254 F.Supp.2d at 862–64. They, like Hallmark, fail to note that a term or condition of employment ends when the employment ends. *See id.*

and sufficient consideration flowing from the non-promising party to support the contract. *Schneider,* 194 S.W.3d at 859. "Consideration," of course, generally consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party. *See* 17A AM.JUR.2D *Contracts* section 113.

Hallmark is not only *not* bound to submit its claims to arbitration, but Hallmark also is *not* bound to keep any other so-called "promise" expressed in the DRP. The DRP specifically states that Hallmark "may at its sole discretion modify or discontinue the DRP at any time." Thus, there is no promise by Hallmark to participate in arbitrating employee claims or in paying arbitrator fees. Hallmark can change the terms of the program, retaining the sole right to select the arbitrator. *See Schneider,* 194 S.W.3d at 858 (president of defendant realty company had sole right to select arbitrator); *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306, 315 (6th Cir.2000) (promise to provide arbitral forum "fatally indefinite").

In order to mitigate the effect of Hallmark's unilateral discretion to alter the terms of the DRP, Hallmark has expressed throughout this litigation a willingness to have the court interpret the program as meaning that it can be modified only prospectively, which we assume means that Hallmark cannot modify the program, nor withdraw from arbitrating, nor refuse to pay its allotted portion of fees, as to any claim or dispute that has already matured. Construing the program so as to prohibit retroactive modification would mean that Hallmark could not unilaterally refuse to pay for arbitration, and could not refuse to participate in arbitration, as to a dispute that had already matured. That concession, though worthy, differs from the language of the DRP,

which was written so as to allow Hallmark a total and complete escape from any and all commitments at any time. *See Schneider,* 194 S.W.3d at 861 (letter from defendant attempting to soften the unconscionable positions of arbitration clause was ineffective because arbitration clause is to be viewed as it existed *at the time it was adopted* ).

In any event, even if we were to construe Hallmark's option in the more restrictive fashion in accordance with its gratuitous gesture, the program would still leave Hallmark with all *its* options, including court access, as to *its* claims against employees, matured or not. And it still, according to its express terms, would leave employees (and, according to Hallmark, former employees) with no option but arbitration for their claims.

### Continued At–Will Employment Does Not Constitute Consideration

Because Hallmark realizes that the program is one-sided, and its revocable DRP promises cannot constitute consideration, Hallmark points to "continuing employment" as consideration. Hallmark maintains that even if there is no mutuality, one day of continued work by the employee after the effective date of the DRP—January 5, 2002—creates a "contract." In fact, Hallmark argues that because Morrow continued working through January 5, 2002, after notice of the DRP, and after having had an opportunity to quit employment, she became legally bound to give up her right of access to court as to Hallmark forever. Hallmark maintains that this would be true even if Hallmark had terminated her on January 6, the day after the DRP went into effect. We suppose, if pressed, Hallmark would take the position that it would be true even if Hallmark had terminated her fifteen minutes—or even

one minute—after the DRP went into effect.

### The Underlying At–Will Employment Relationship Cannot Support the Purported Arbitration "Contract"

 Employer policies unilaterally imposed on at-will employees (*i.e.,* terms and conditions of employment) are not contracts enforceable at law. *See Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661, 662 (Mo. banc 1988); *McIntosh,* 48 S.W.3d at 89. It is understood in such cases that the employer reserves the right to discontinue or modify such policies as it chooses. *See Johnson,* 745 S.W.2d at 662. For example, if Hallmark wished to revoke the Final Internal Review process (Level Two) of the DRP, Hallmark is legally free to make that modification, just as it could modify its policy concerning vacation days. *See id.* at 662–63.

 Employment-at-will is not a *legally enforceable employment relationship* because it is terminable at the will of either party, on a moment-by-moment basis. *See id.* It is sometimes called a "unilateral contract" because there is an implied (if not expressed) promise that if the employee performs work as directed, the employer will pay. But that does not make it a contract of *employment* that is legally enforceable.

 Typically, "[a]n essential element to an employment contract is a statement of duration." *Luethans v. Washington Univ.,* 894 S.W.2d 169, 172 (Mo. banc 1995). Alternatively, if there is not a specific duration expressed, the contract must be one that places limits on the employer's rights to discharge at will. *See, e.g., Stephenson v. Vill. of Claycomo,* 246 S.W.3d 22, 29 (Mo.App.2007). One cannot have an employment contract without either an expressed duration or some specified limitations on discharge.

 Terms and conditions of at-will employment are not enforceable at law as *contractual duties.* It cannot be maintained, for instance, that a Hallmark policy that requires employees to call in when unavailable due to sickness could be enforced by Hallmark bringing suit against an employee it discharged for failing to call in sick, even if the employee's failure directly caused Hallmark to lose a profitable contract. Because the employment is at-will, Hallmark could enforce its policy by discharging or otherwise disciplining the employee. But the right to enforce its conditions of employment by employee discipline should not be confused with a *contractual right to sue the employee* in court.

 In at-will employment, either party can announce at any time that there are new conditions on either working or on providing work. The other can say yes or no. When the employment ends, so do the duties; this is because, as we have said, at-will employment, by its very moment-by-moment nature, is not a legally enforceable contract of employment. *See Luethans,* 894 S.W.2d at 172. To belabor the obvious: if an employer, for instance, announces to an employee that he or she will be reassigned to the night shift, and the employee declines the night shift, the employee is not entitled to legally compel the employer to keep offering the day shift. Neither is the employer entitled to legally compel the employee to work the night shift. Each one may terminate the employment, but neither one has an action at law.

 Obviously, the only legally enforceable promise created out of at-will employment is the employer's promise, whether express or implied, to pay the employee for the work performed by the employee. The employer can enforce, through employee discipline, many differ-

ent conditions of employment; but the employer has no legal cause of action for breach of contract.

### The "Offer" of "Continuing Employment"

Hallmark contends that the "offer" of "continuing employment" supplies the consideration for the arbitration program. The problem with Hallmark's theory of consideration, of course, is that, as we have noted, *there is no offer* of continuing employment. The DRP explicitly says the employees will *remain* at-will employees after the effective date of the DRP. All of the employees know that continued employment is subject to Hallmark's discretion.

Hallmark's position, for instance, is that it lawfully terminated Ms. Morrow's at-will employment when it was no longer pleased with her services. It terminated her a little over a year after the DRP went into effect, but the legal posture of the case would be the same if it had terminated her fifteen minutes after the DRP went into effect. Ms. Morrow had no employment contract, and no offer of "continuing employment," with Hallmark.

We also reject the notion that, *after* the DRP went into effect, the work she was *then* allowed to do could constitute consideration, as though a contract could be formed in retrospect. Obviously, there must be a meeting of the minds at the time the purported contract is formed. "Continued employment" was neither *promised* at that time nor *received* at that time— that is, at the time the alleged contract was formed.

The idea that an employer can create any legal contract it dares to create (based on a condition of at-will employment) cannot be sustained upon reflection. Imagine, for instance, an employer publishing a memo to employees stating that:

Anyone who continues to work for us through next Monday will be conclusively deemed to have agreed, as a condition of remaining in our employ through that date, that you will contribute twenty dollars per month over the next ten years to the National Association of Manufacturers (NAM), *whether or not you remain employed here during that time.* If you do not agree, you will need to resign your employment immediately, because by continuing to work, you are agreeing.

While it is unlikely that any employer would do that, we are here talking about contract *analysis.* If an employer *did* impose such a requirement, it would be impossible to conceive that anyone would seriously argue that because an employee continued to work through the next Monday before being terminated, there was formed a true, legally enforceable contract to support the NAM, rendering the requirement legally enforceable as a contractual provision. Similarly, a requirement pursuant to a collective bargaining agreement that the employees must support their union as a condition of employment would be understood to apply only as long as the employee remained in employment, and would be enforceable only through employee discipline, not through the courts. Nor could an employer effectively argue that the fact that the employee continued to work for a year after the requirement became effective somehow constituted legal consideration supporting the contract.

### The Enforcement of Restrictive Covenants Does Not Show That "Continuing Employment" Constitutes Legal Consideration in This Context

Despite the foregoing analysis, Hallmark, in an effort to demonstrate that

"continuing employment" *can* constitute consideration for a legally binding covenant, points to covenants not to compete, which have been enforced by the courts even *after* the employment ends.

While there might be some similarities in the enforcement of covenants not to compete and the enforcement of employer-imposed arbitration programs, there are fundamental differences as well. Although covenants not to compete generally must be in writing to be enforceable, they are not true creatures of contract law, but are more about equity than about contracts, even in cases where there is a formal employment agreement. *See, e.g. Systematic Bus. Servs., Inc. v. Bratten,* 162 S.W.3d 41 (Mo.App.2005). "The ordinary rules of contractual construction and enforcement are not necessarily applicable to non-compete agreements." *Cont'l Research Corp. v. Scholz,* 595 S.W.2d 396, 399 (Mo.App.1980). Historically, even in the absence of an express covenant, a former employer could maintain an action to restrain a former employee's unfair competitive use of an advantage gained from the employer. *See generally* K.H. Larsen, Annotation, *Former Employee's Duty, in Absence of Express Contract, Not to Solicit Former Employer's Customers....,* 28 A.L.R.3d 7, section 3[a] (1969); *see also, A.B. Chance Co. v. Schmidt,* 719 S.W.2d 854, 859–60 (Mo.App.1986) (regardless of whether agreement existed, employer enjoined from releasing confidential and proprietary information on equitable grounds); *Jerrold–Stephens Co. v. Gustaveson, Inc.,* 138 F.Supp. 11, 15 (W.D.Mo.1956) (protection of employer's secrets did not depend upon a valid and enforceable express covenant, but could be based in equity); *David Fox & Sons, Inc. v. King Poultry Co.,* 47 Misc.2d 672, 262 N.Y.S.2d 983, 987 (1964) (former salesmen restrained from soliciting plaintiff's customers on equitable grounds, though no expressed covenant); 42 AM.JUR.2D *Injunctions* section 136 (2000) (violation of covenant not to compete may be enforced *even beyond* term specified by the covenant where it would be inequitable not to do so).

Also, unlike contracts generally, restrictive covenants have historically been considered to be presumptively invalid. *Cont'l Research,* 595 S.W.2d at 400. The employer was required to show a legitimate proprietary interest worthy of judicial protection in equity. *Id.*[7] Further, where a protectable interest was shown, such covenants could be enforced only to the extent of parameters of reasonableness, no matter how expansive the terms of the written covenant (again, unlike judicial enforcement of other contracts). *Id.*

The notion that there was "consideration" for the restrictive covenant in the employer's provision of "continued employment" was, to be precise, based on recognition of the practical reality that by hiring the employee, the employer was exposing itself to the risks of the employee's access to protectable information and contacts (including customer relationships) in which the employer had invested substantial capital. Thus, it would be more accurate to say that the justification for the covenant (the "consideration") was not the continued

---

**7.** *See also Schmersahl, Treloar & Co. v. McHugh,* 28 S.W.3d 345, 350 (Mo.App.2000) (holding unenforceable a covenant purporting to prohibit a former employee from hiring away other employees on the ground that an employer had no legitimate proprietary interest in its at-will employees). This case was legislatively reversed in part by section 431.202, which became effective July 1, 2001. Under the legislation, reasonable restrictions against recruitment of employees by former employees are permissible under certain conditions.

employment *per se,* but rather the employer's allowing the employee (by virtue of the employment) to have *continued access* to the protectable assets and relationships. Thus, it is, we suggest, merely a reductionism, and not precisely accurate, to say that the "consideration" was "continued employment."

In any event, if we were to apply here the judicial approach ordinarily applied to covenants not to compete, we would regard the arbitration program as presumptively invalid to the extent that it is anything more than a term of employment (ending when the employment terminates), until Hallmark had demonstrated a legitimately protectable business interest served by precluding access to the courts by former employees. Hallmark has not asked that we take that approach, and Hallmark does not attempt to make such a showing of a protectable business interest. Hallmark instead relies only on the false premise that the arbitration program is an enforceable legal contract, with the consideration being the provision of "continuing employment."

For these reasons, we believe it is a mistake to think that the judicial approach to enforcement of a covenant not to compete is comparable to enforcement of an employer-dictated condition of continued employment requiring the employee to arbitrate claims against the employer. We enforce covenants not to compete for equitable and policy reasons when there is a legitimate employer business interest warranting protection. *See Cont'l Research,* 595 S.W.2d at 399–400. We do not enforce them simply because the employer managed to extract such a covenant from the former employee. *See Easy Returns Midwest, Inc. v. Schultz,* 964 S.W.2d 450, 453 (Mo.App.1998).

## VII. Summary

There can, of course, be an enforceable contract to arbitrate claims entered into between and employer and employee. The program that Hallmark purported to impose on the at-will employment relationship, however, was not a "contract to arbitrate" under Missouri law. It was presented strictly as a term and condition of employment. It lacked any promise by Hallmark that was potentially enforceable against Hallmark. It further lacked any other form of legal consideration for the employees giving up a right of access to the courts.

There was acquiescence to the arbitration program by the employee, but only as a term or condition of employment, which term or condition, by virtue of the nature of the employment relationship, ended when the employment ended.

Because of the disposition we reach on the contract issue, we need not reach other issues raised by Morrow as to whether Hallmark's program required an explicit waiver of right to jury trial, or whether the program would allow effective vindication of statutory rights (*i.e.,* whether the program as structured should be considered unconscionable in any respect).

## VIII. Conclusion

For all of the foregoing reasons, we hold that the trial court erred in compelling arbitration and in accepting the arbitrator's award. The judgment is reversed. The case is remanded to the circuit court for further proceedings.

LOWENSTEIN, SPINDEN, NEWTON, HOLLIGER, WELSH, and DANDURAND, JJ., concur in the opinion of SMART, J., for the court.

AHUJA, J., concurs in result, with separate opinion.

ELLIS, J., joins in the separate opinion of AHUJA, J.

ALOK AHUJA, Judge, concurring.

Although I do not necessarily disagree with what is written in the majority opinion, I believe this case can be decided on somewhat narrower grounds, without addressing all of the issues the majority discusses. I accordingly concur in the result.

To my mind, two provisions of Hallmark's Dispute Resolution Program, appearing in the policy's first two pages, defeat its argument that the policy created an enforceable arbitration contract. First, on its opening page the policy states: "This procedure does not change the employment-at-will relationship between the Company and its employees." On the following page, the program document states that "[t]he Company may at its sole discretion modify or discontinue the DRP at any time."

These two statements lead me to conclude that, in promulgating the DRP, Hallmark made no enforceable promise to Ms. Morrow that could constitute consideration for her reciprocal agreement to be bound by it.

A bilateral contract "that contains mutual promises imposing some legal duty or liability on each promisor is supported by sufficient consideration to form a valid, enforceable contract." *Sumners v. Serv. Vending Co.*, 102 S.W.3d 37, 41 (Mo.App. S.D.2003). However, to constitute sufficient consideration, a promise of one of the contracting parties must be binding on that party.

> [A] promise *is not* good consideration unless there is mutuality of obligation, so that each party has the right to hold the other to a positive agreement. Mu-

tuality of contract means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, *neither party is bound unless both are bound.*

*Id.* (second emphasis added; citations and quotation marks omitted). "An illusory promise is not a promise at all and cannot act as consideration; therefore, no contract is formed." *Magruder Quarry & Co. v. Briscoe*, 83 S.W.3d 647, 650–51 (Mo.App. E.D.2002).

Under well-established contract law, an agreement in which one party retains the unilateral ability to avoid its contractual obligations is illusory and unenforceable. "Retaining the right to cancel a contract or to avoid one's promise is an unenforceable, illusory promise." *Am. Laminates, Inc. v. J.S. Latta Co.*, 980 S.W.2d 12, 23 (Mo.App. W.D.1998); *see also Estate of Buchanan*, 840 S.W.2d 888, 889 (Mo.App. E.D.1992) (where decedent "retained the power to cancel her promise" to donate money to college, promise held illusory; despite decedent's partial fulfillment of pledge, "her promise is illusory to the extent it remained executory"); *Fenberg v. Goggin*, 800 S.W.2d 132, 136 (Mo.App. E.D.1990) (finding that "no contract was created" where "plaintiff retained the privileged power to avoid his promise" by selling property he had agreed to permit defendant to use; "In reality, he promised nothing; therefore his promise was an 'illusory promise,' neither enforceable against plaintiff, nor operative as consideration for defendant's return promise" to construct a building on plaintiff's property).

By retaining the right—"at its sole discretion" and "at any time"—to modify *or discontinue* the DRP, Hallmark rendered any promise to Ms. Morrow that the DRP would be available to her fatally illusory. As the majority opinion recognizes, Ms.

Morrow did not have an enforceable right to force Hallmark to arbitrate covered claims, where Hallmark could completely discontinue the program without her consent. Although not dispositive, I note that multiple decisions from other jurisdictions have found arbitration agreements unenforceable where one of the parties retains the right to radically modify or terminate an arbitration program. *See, e.g., Morrison v. Amway Corp.,* 517 F.3d 248, 257 (5th Cir.2008) (arbitration agreement unenforceable where "[t]here is nothing in any of the relevant documents which precludes amendment to the arbitration program—made under Amway's unilateral authority . . .—from eliminating the entire arbitration program or its applicability to certain claims or disputes"); *Dumais v. American Golf Corp.,* 299 F.3d 1216, 1219 (10th Cir.2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306, 315–16 (6th Cir.2000) (employer's "promise to provide an arbitral forum is fatally indefinite" where employer "has unfettered discretion in choosing the nature of that forum"; employer's "right to choose the nature of its performance renders its promise illusory").[1]

Nor do I believe that, in the present circumstances, Ms. Morrow's continued employment by Hallmark constituted an enforceable promise that could supply consideration as of the time this agreement was purportedly entered. Far from containing any promise that Ms. Morrow's employment would continue, for any definite or even indefinite period, the DRP itself prominently emphasizes that Ms. Morrow's employment remained at-will, meaning that she could be discharged at any time, for any (or no) reason, subject only to recognized legal restrictions. Thus, as the majority opinion notes, Ms. Morrow had no enforceable legal right to continued employment with Hallmark. Further, it is significant that Hallmark sought to impose the DRP on Ms. Morrow during the course of her existing employ-

1. As Hallmark argues, in certain circumstances "an implied obligation to use good faith is enough to avoid finding a contract null and void due to an illusory promise." *Magruder Quarry & Co. v. Briscoe,* 83 S.W.3d 647, 650–51 (Mo.App. E.D.2002); *see also Cordry v. Vanderbilt Mortgage & Fin., Inc.,* 445 F.3d 1106, 1110 (8th Cir.2006) (Missouri law). At the same time, however, the implied covenant of good faith and fair dealing "has nothing to do with the enforcement of terms actually negotiated and cannot block [the] use of terms that actually appear in the contract." *Stone Motor Co. v. Gen. Motors Corp.,* 293 F.3d 456, 466–67 (8th Cir.2002) (Missouri law) (citations and quotation marks omitted); *see also Giessow Rests., Inc. v. Richmond Rests., Inc.,* 232 S.W.3d 576, 579 (Mo.App. E.D.2007) ("A court will not 'find an implied covenant if the parties have either dealt expressly with the matter or have intentionally left the contract silent on the point.'" (citation omitted)); *Bishop v. Shelter Mut. Ins. Co.,* 129 S.W.3d 500, 506 (Mo.App. S.D.2004) (covenant of good faith and fair dealing does not limit employer's right to terminate at-will employee; "This follows because the implied covenant cannot be used to contradict or override the express employment terms contained in a contract, i.e., that an employee can be terminated for any cause."); *Mo. Consol. Health Care Plan v. Cmty. Health Plan,* 81 S.W.3d 34, 45–49 (Mo.App. W.D.2002). Thus, any implied duty of good faith and fair dealing could not "trump" Hallmark's right to discontinue the DRP. While Hallmark may have been obligated by the implied covenant not to exercise its unilateral discretion in bad faith, or in an arbitrary and capricious manner, *see id.,* this does not alter the fact that Hallmark alone retained the right to completely negate its obligations under the DRP at any time. This is not a case (like those Hallmark cites) where an obligation to use "reasonable efforts" in performance of discretionary contractual duties could save a contractual promise from illusoriness.

ment, and not as a condition of an initial employment offer; nor did Hallmark enhance Ms. Morrow's compensation or other conditions of employment in exchange for her "agreement."

In this respect, this case is similar to *Sumners v. Service Vending Co.,* 102 S.W.3d 37 (Mo.App. S.D.2003). *Sumners* held unenforceable a Buy–Sell Agreement which imposed on a minority shareholder-employee the obligation to first offer his shares to the majority shareholders at a specified price. In response to the claim that the minority shareholder's continued employment constituted consideration for his obligations under the Buy–Sell Agreement, the Court noted that the agreement "does not expressly promise continued employment, nor does it contain language from which it can be inferred, nor is there evidence to support such a claim." *Id.* at 43 n. 3. Further, the Court observed that the minority shareholder was an existing employee at the time the Agreement was proposed, and that the employer-majority shareholders did not "promise any different employment terms ... than had previously existed," or offer to change the method for calculating or the amount of the minority shareholder's compensation. *Id.* at 43.

Similarly, in *Middleton v. Holecroft,* 270 S.W.2d 90, 92–93 (Mo.App.1954), an agreement gave an employer the right to employ defendant "at my option," and provided that defendant was "free to seek employment elsewhere" if employer

"fail[ed] to offer you work." *Id.* at 91. The court held that no enforceable agreement was created, because the defendant could not have enforced any right to employment. *Id.* at 93. *Middleton* also held that the contract was not rendered enforceable by the parties' partial performance under it, because "this did not obligate the plaintiff to furnish the defendant work at any future time. The plaintiff still had his 'option' to furnish work or not as he desired." *Id.* at 94.[2]

Hallmark's "continued employment as consideration" argument suffers from the same defects as in *Sumners* and *Middleton:* the DRP does not itself promise continued employment (indeed, it emphasizes the contrary); and Hallmark sought to impose the DRP not as a condition of extending an employment offer, but instead on an existing employee *without any change* in the conditions of Ms. Morrow's employment, or her compensation.[3]

Thus, neither the promise of access to the DRP, nor Ms. Morrow's continued employment, gave her enforceable rights against Hallmark which could constitute consideration for this bilateral contract. As such, the agreement is unenforceable against her. *See Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1128, 1133 (7th Cir.1997) (Cudahy, J. concurring) (where employer "reserve[d] the right at any time to modify, revoke, suspend, terminate, or change any or all terms of this Manual," and emphasized that "employees

---

**2.** I agree with the majority that the restrictive covenant cases Hallmark cites are distinguishable: in those cases, a restrictive covenant is justified in order to safeguard particular "protectable interests" of the employer, and in exchange for agreeing to such a restriction the employee is given not only employment, but access to competitively sensitive information, methods or relationships.

**3.** We are not presented here with an arbitration program imposed only on newly-hired employees; one accompanied by an increase in compensation or substantive changes to the employee's terms or conditions of employment; or one in which the employer's right to modify or terminate the program is explicitly and meaningfully limited. I express no opinion on the legality of a hypothetical arbitration program containing one or more of these features.

can be terminated at any time, with or without notice, and with or without cause," contract illusory because "[i]t is quite clear that [the employer] has committed itself to do nothing").

I accordingly concur in the result. Because I believe the illusoriness of Hallmark's promises prevents enforcement of the DRP, I find it unnecessary to address other issues discussed in the majority opinion.

Judge JOSEPH ELLIS concurs.