Kimberly FRYE, Respondent,

v.

**SPEEDWAY CHEVROLET CADILLAC, et al.,**
**Appellants.**

**No. WD 71757.**

Missouri Court of Appeals,
Western District.

Aug. 10, 2010.

Kevin D. Case and David J. Roberts, Kansas City, MO, for appellants.

Charles K. Baldwin, Liberty, MO, for respondent.

Before Division One: JAMES M. SMART, JR., Presiding Judge, MARK PFEIFFER, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Speedway Chevrolet Cadillac, Inc. ("Speedway"), Daniel F. Ladd ("Ladd"), the President of Speedway, and Brice Ackerman ("Ackerman"), the General Sales Manager of Speedway, (collectively the "Defendants") appeal from the trial court's order denying Defendants' motion to compel arbitration of Kimberly Frye's employment related claims. The Defendants contend that a program adopted by Speedway after Kimberly Frye began employment with Speedway is a legally enforceable contract. We affirm the trial court's denial of Defendants' motion to compel arbitration.

## Facts and Procedural History

In early May 2003, Kimberly Frye ("Kimberly")[1] began employment with Speedway as a finance manager. On or about March 1, 2004, Speedway implemented a dispute resolution program ("Program") effective as of that date. Speedway contends that Kimberly signed an acknowledgement agreeing to be bound by the Program. Kimberly denies signing the acknowledgement.

Speedway's Program described four options for resolution of employee disputes, beginning with in-house efforts to resolve issues and escalating to submission of disputes to mediation and/or binding arbitration. The Program defined covered claims broadly as "any legal or equitable claim, demand or controversy, in tort, in contract, under statutory or common law doctrines to include future statutory or common law doctrines that do not exist as of the date of this policy, or alleging violation of any legal obligation, between persons bound by the Plan." Speedway contends the Program mutually bound Speedway and its employees to submit their disputes to resolution pursuant to the Program.

The Program stated that "after March 1, 2004, your decision to accept employment

---

1. At the time she began employment with Speedway, Kimberly's last name was Kimbrell. Larry Frye ("Larry") was hired by Speedway on July 1, 2003. Larry and Kimberly later married. Thus, to avoid any confusion, we refer to Kimberly Frye and Larry Frye by their first names.

or continue your current employment will mean that you have agreed to and are bound by the terms of the Program.... This will be true both during your employment and should you terminate, after your employment." The Program advised that the "at-will" employment relationship between the Company and its employees was modified, but only to the extent expressly stated in the Program. The Program expressly noted that "employees of the Company may still quit or be fired at any time for any reason, or for no reason."

The Program permitted Speedway the unilateral right to modify the Program. The Program provided that "no amendment shall apply to a Dispute of which Sponsor had actual notice on the date of the amendment."

In early December, 2004, Speedway terminated Kimberly's employment.[2] Kimberly filed claims with the Equal Employment Opportunity Commission and the Missouri Human Rights Commission asserting sex discrimination, hostile working environment, retaliation, and defamation. Following receipt of a right to sue letter, Kimberly timely filed a lawsuit on October 26, 2006, in the Circuit Court of Johnson County, Missouri. Kimberly alleged that the Defendants engaged in discrimination against her due to her sex in violation of the Missouri Human Rights Act and "comparable federal statutes," that the Defendants created a sexually hostile work environment, that she was terminated in retaliation for her complaints regarding the Defendants' alleged discriminatory conduct, and that the Defendants made defamatory statements about her to third parties.[3]

Though the Program provided that "[i]f legal action is instituted, the court will be requested to refer the matter to the Dispute Resolution Program for final resolution," Speedway did not immediately respond to Kimberly's lawsuit with a motion to compel arbitration. Instead, on January 19, 2007,[4] the Defendants removed the case to the U.S. District Court for the Western District of Missouri since Kimberly's petition asserted claims seeking relief under federal law. Kimberly amended her petition to delete claims for relief under federal law. The case was remanded to the circuit court on March 15, 2007.

On April 12, 2007, each Defendant filed an answer. Although the answers raised numerous affirmative defenses, none of the answers asserted that Kimberly was obligated to arbitrate her claims pursuant to the Program. Speedway's answer asserted a counterclaim against Kimberly alleging fraud, breach of fiduciary duty, and

---

**2.** Larry was also terminated by Speedway on or about the same date.

**3.** Larry filed a separate lawsuit against the Defendants asserting claims of discrimination and various common law claims arising out of his employment and termination.

**4.** At oral argument, counsel for both parties confirmed that between the time Kimberly filed her lawsuit and Speedway's removal of Kimberly's case to federal court, a three month period, Speedway was in the midst of pursuing a motion to dismiss Larry's lawsuit. That motion was filed on August 2, 2006. The motion alleged that Larry (who, along with Kimberly, filed for Chapter 13 bankrupt-

cy protection in March, 2006) had abandoned his claims because Larry and Kimberly affirmatively indicated in their bankruptcy filings that they did not have any contingent, unliquidated claims as an asset. Because Kimberly filed for bankruptcy protection with Larry as a joint debtor, the disposition of Speedway's motion to dismiss in Larry's case was of equal importance to Kimberly's case, though not technically filed in Kimberly's case. Speedway's counsel conceded at oral argument that had the motion to dismiss in Larry's case been granted, an identical motion to dismiss would have been filed in Kimberly's case. However, the motion to dismiss in Larry's case was denied on December 15, 2006, and was thus never filed in Kimberly's case.

civil conspiracy. On April 20, 2007, Kimberly filed a reply to Speedway's counterclaim. On March 27, 2008, Kimberly propounded discovery on the Defendants.[5]

On April 29, 2008, eighteen months after Kimberly's lawsuit was filed, the Defendants filed a joint motion to compel arbitration. Kimberly opposed the motion. Kimberly argued that Defendants had waived their right to seek enforcement of the Program; that the acknowledgment and agreement form the Defendants' claimed Kimberly had signed did not comport with section 435.460;[6] that the Program was an adhesive, illusory, and unconscionable contract; that the Program did not cover her claims against co-employees Ladd and Ackerman; and that the Program did not cover her claim of defamation.

On June 27, 2008, the trial court heard arguments regarding the Defendants' motion to compel arbitration.[7] Kimberly filed supplemental suggestions opposing the Defendants' motion to compel arbitration on July 17, 2008, relying on the analysis set forth in this court's June 30, 2008

opinion in *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15 (Mo.App. W.D.2008).

On August 26, 2009, the trial court denied Defendants' motion to compel arbitration by a docket entry. On September 25, 2009, the Defendants requested that the trial court's docket entry be modified to denote that it was a "judgment." On November 9, 2009, the trial court entered an Order Denying Motion to Compel Arbitration.[8] The order stated that "this formal, written order compl[ies] with the requirements of Mo.Rev.Stat. Section 435.440.1 and 9 U.S.C. Section 16(a)(1)(B)."[9]

Defendants appeal.[10]

## Standard of Review

■ When faced with a motion to compel arbitration, we must consider three factors. First, we must "determine whether a valid arbitration agreement exists." *Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 345 (Mo. banc 2006) (citations omitted). Second, if a valid arbitration agreement exists, we must determine "whether the specific dispute falls within the scope of the arbitration agreement." *Id.* Third,

---

5. The eleven month delay between Kimberly's reply to Speedway's counterclaim and the commencement of discovery is not explained by the record in Kimberly's case. The trial court's docket sheet reflects no other activity in the case during this period of time.

6. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated. Section 435.460 addresses the location and font size of language used to announce a party's agreement, by signature on a document, to submit claims to arbitration.

7. Defendants also filed a motion to compel arbitration in Larry's case. The trial court heard oral argument on the motions to compel in both Kimberly's and Larry's cases at the same time, as the same counsel represent the parties in both cases.

8. Defendants' motion to compel arbitration was denied in Larry's case on the same date by an identical trial court order.

9. "This Court recognizes the appealability of orders denying arbitration despite the fact that such orders are not final judgments, under the influence, if not the command of provisions of the Federal Arbitration Act and the Missouri Uniform Arbitration Act relating to appealability of such orders." *Lawrence v. Beverly Manor*, 273 S.W.3d 525, 527 n. 2 (Mo. banc 2009) (*citing* 9 U.S.C. section 16(a)(1)(B) and section 435.440.1).

10. Defendants also appealed the trial court's denial of the motion to compel arbitration in Larry's case. Though the two matters are not formally consolidated, they were consolidated for oral argument before this court. This court's order and memorandum in *Larry Frye v. Speedway Chevrolet Cadillac*, 315 S.W.3d 786 (Mo.App. W.D.2010) has been issued contemporaneously with this Opinion.

if a valid arbitration contract exists, and if the subject dispute is within the scope of the arbitration provision, then we must determine whether the arbitration agreement is subject to revocation under applicable contract principles. *See Kansas City Urology, P.A. v. United Healthcare Servs.*, 261 S.W.3d 7, 11, 14 (Mo.App. W.D. 2008).[11] "In making these determinations, [we] should apply the usual rules of state contract law and canons of contract interpretation." *Nitro Distrib., Inc.*, 194 S.W.3d at 345.

■ Appellate review of a trial court's denial of a motion to compel arbitration is *de novo*. *Lawrence v. Beverly Manor*, 273 S.W.3d 525, 527 (Mo. banc 2009). We also review *de novo* whether the right to insist on arbitration, if present, has been waived. *MFA, Inc. v. HLW Builders, Inc.*, 303 S.W.3d 620, 625 (Mo.App. W.D.2010).

The trial court's order denying the Defendants' motion to compel arbitration does not specify the basis for the trial court's decision. We do not know, therefore, whether the trial court found there was no enforceable contract to arbitrate, whether the trial court found that there was an enforceable contract but that the claims asserted by the parties were in whole or in part beyond the scope of an enforceable contract to arbitrate, whether the trial court found that there was an enforceable contract to arbitrate but that the contract was subject to revocation because it was procedurally and substantively unconscionable, or whether the trial court found there was an enforceable contract to arbitrate but that the right to seek its enforcement had been waived. The absence of such guidance, however, is not critical to our review. Our primary focus

is on whether the trial court's result is correct, not the route taken to reach it. *City of Kansas City v. N.Y.–Kan. Bldg. Assocs., L.P.*, 96 S.W.3d 846, 853 (Mo.App. W.D.2002).

## Analysis

Speedway asserts four points on appeal. Each point begins with the statement that the trial court erred in denying Defendants' motion to compel arbitration because the parties entered into a valid and enforceable contract and Kimberly's claims fall within the scope of that contract. Following this common statement, each point then registers a specific argument in support of the general statement. First, Speedway contends that the Program is not illusory or unconscionable as Speedway reserved the right to make only prospective changes and as the mutual promises exchanged between Speedway and its employees were sufficient to provide consideration for the contract. Second, Speedway contends that it did not waive the right to compel arbitration. Third, Speedway contends that the Program covers Kimberly's claims against co-employees Ladd and Ackerman. Fourth, Speedway contends that the Program is subject to the Federal Arbitration Act and that the requirements of section 435.460 are not applicable. As point one and point two are dispositive of this appeal, we will focus our discussion accordingly and need not address the issues raised in Speedway's third or fourth points.

## Point One

Speedway contends in its first point on appeal that the Program is a valid and enforceable agreement and is not illusory

11. It is in evaluating this third factor that our courts discuss whether a contract should be revoked because it is procedurally and substantively unconscionable. However, the issue of whether an arbitration contract should be revoked because it is unconscionable is never reached if the agreement is determined under the first factor to lack the necessary indicia of a valid and enforceable contract.

or unconscionable because both Speedway and its employees exchanged promises sufficient to provide consideration for the Program and because Speedway could only make prospective changes to the Program.

■■■ Missouri substantive law governs whether a valid arbitration contract exists. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 856 (Mo. banc 2006).[12] "It is a firmly established principle that parties can be compelled to arbitrate against their will only pursuant to an agreement whereby they have *agreed* to arbitrate claims." *Morrow*, 273 S.W.3d at 21. Though employers and employees are free to enter into an agreement to arbitrate disputes, the agreement is not valid unless it reflects the essential contract elements required under Missouri law. *Id.* at 22. It follows that arbitration may not be unilaterally imposed on a party when there is not a valid and enforceable agreement to arbitrate. *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 427–28 (Mo. banc 2003). The elements required to form a valid contract in Missouri are "offer, acceptance, and bargained for consideration." *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988).

*Morrow* is the seminal case addressing these essential contract elements in the context of enforceability of an arbitration provision against at-will employees. 273 S.W.3d 15. In *Morrow*, the employer adopted a dispute resolution program ("DRP"). *Id.* at 19. The DRP provided that an employee's continued employment after the policy's effective date would be deemed to be the employee's agreement to submit to and be bound by the policy. *Id.* The DRP stated that employees would remain at-will employees after the effective date of the DRP. *Id.* at 27. The DRP defined covered claims as employment-related claims filed by an employee against the employer, but not claims Hallmark might have against its employees. *Id.* at 23. The DRP described four escalated levels of recourse to address employee claims, the last level being mandatory arbitration. *Id.* at 19. The DRP provided that Hallmark could, in its sole discretion, modify or discontinue the DRP at anytime. *Id.* at 25. This language did not limit amendments to prospective application. *Id.*

Morrow was terminated. *Id.* at 19. Morrow sued Hallmark for age discrimination and retaliatory discharge. *Id.* Hallmark argued that Morrow's willing continuation of her at-will employment following adoption of the DRP, where the plaintiff knew that her decision to continue employment would be viewed as an agreement to submit to the DRP, constituted an enforceable contract. *Id.* at 25–27.

We found that even if Morrow could be viewed as having "accepted" the arbitration program by continuing her employment after the DRP became effective, *id.* at 29,[13] the DRP was not an enforceable

---

**12.** Speedway spends considerable time in its brief addressing whether the Federal Arbitration Act, 9 U.S.C. section 1 *et seq.* ("FAA") or the Missouri Uniform Arbitration Act, Chapter 435, RSMo ("MUAA") controls interpretation and enforcement of the Program. We need not answer this question. Both the FAA and the MUAA presume, in the first instance, the presence of a legally enforceable contract to arbitrate. *See, e.g., Houlihan v. Offerman & Co.*, 31 F.3d 692, 694–95 (8th Cir.1994) ("Before a party may be compelled to arbitrate under the Federal Arbitration Act, the district court must engage in a limited inquiry to determine whether a valid agreement to arbitrate exists between the parties....").

**13.** *Morrow* did not expressly conclude that "acceptance" of an employer imposed arbitration program can be found by the fact that an at-will employee continues employment on notice that the decision to continue employment will be viewed by the employer as acquiescence to the arbitration program. We do note our Eastern District has expressly concluded that an at-will employee's continued

contract to arbitrate because it lacked legal consideration. *Id.* at 18. In other words, we found that even if offer and acceptance were present, the DRP was not an enforceable contract because it lacked the third essential element of an enforceable contract—consideration. The DRP did not "involve mutual promises because Hallmark reserve[d] the right, in its sole discretion, to modify or revoke the provisions" of the DRP. *Id.* Looking elsewhere for consideration, this court found that the DRP lacked legal consideration "because 'continued employment' in the at-will employment relationship does not constitute legal consideration" for an employer's request that an employee give up their right of access to the courts. *Id.* We thus concluded that the DRP was merely a unilaterally imposed term or condition of employment that did not bind Morrow, an at-will employee, following termination of her employment. *Id.* at 29.

Kimberly contends that *Morrow* is dispositive of this case. Speedway disagrees. Speedway contends there are three differences between the DRP and the Program which distinguish this case from *Morrow.* First, Speedway contends Kimberly signed the Program, where Hallmark only claimed an employee's continued employment could be deemed acceptance of the DRP. Second, Speedway claims that the Program incorporates mutual promises. Third, Speedway argues that although it

had the unilateral right to modify the Program, it could only do so by notifying employees about the amendment in writing, and it could not apply an amendment to disputes about which it had "actual knowledge" at the time of the amendment. Speedway thus argues that in contrast to the DRP in *Morrow,* the Program possesses the three essential contract elements (offer, acceptance, and consideration) and is an enforceable contract to arbitrate. We will address each of the distinctions from *Morrow* argued by Speedway.

***Signature***

In its brief, Speedway contends Kimberly signed an "Acknowledgement and Agreement" dated May 5, 2003, (the day Kimberly commenced employment) wherein Kimberly acknowledged receipt of, and agreed to be bound by, the terms and conditions of Speedway's Employee Handbook and the Speedway Alternative Dispute Resolution program. Kimberly denies signing this Acknowledgement. The trial court did not resolve this factual dispute in its order denying the motion to compel arbitration, and it expressly noted on the record during oral argument on the motion that it would not take evidence on the issue of signature. The trial court observed that it need not resolve the *factual* issue of signature if it otherwise found the Program to be unenforceable as a matter of law, or enforceable but waived as a matter of law.

 Even assuming the truth of Speedway's allegation in its brief,[14] Kim-

---

employment is not sufficient to constitute acceptance of an employer imposed arbitration program. *Kunzie v. Jack–In–The–Box, Inc.,* —— S.W.3d —— (Mo.App. E.D.2010) (not yet released for publication).

**14.** We are troubled by Speedway's allegation in its brief that Kimberly signed the Program by signing an Acknowledgment on May 5, 2003, shortly after she began her employment. The Acknowledgment is facially suspect, as it purports to bear Kimberly's signature dated May 5, 2003, though the document includes language affirming both

the existence of, and an agreement to be bound by, the Program—which was not adopted until March 1, 2004. Moreover, Speedway's allegation in its brief with respect to when Kimberly allegedly "signed" the Program is materially different from its allegation in the motion to compel filed with the trial court. In the motion, Speedway alleged that Kimberly signed an employee handbook when she began employment on May 3, 2003, that the Program was later adopted on March 1, 2004, and that Kimberly signed the Program on March 5, 2004, by

berly's signature agreeing to be bound by the Program, whether provided at the commencement of her employment or thereafter, would *at best* establish the second element necessary to form an enforceable contract—acceptance. Acceptance of a unilateral demand is acquiescence, of course, but in the absence of consideration, it does not bind the acceptor contractually.[15] Thus, Kimberly's signature would not establish, nor replace the need for, legal consideration sufficient to support an agreement to waive the constitutional right of access to the courts. As we noted in *Morrow,* though employers and employees are free to *enter into* an agreement to arbitrate disputes, **the agreement is not valid** unless it reflects the essential contract elements required under Missouri law. 273 S.W.3d at 22.

We turn our discussion, therefore, to Speedway's contention that the Program includes mutual promises sufficient to provide legal consideration for its employees' waiver of the right to access the courts.

### Mutual Promises

■■■■ " 'Consideration' ... generally consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party." *Id.* at 25. It is an elemental principle of contract law that a contract "that contains mutual promises imposing some legal duty or liability on each promisor is supported by sufficient consideration to form a valid, enforceable contract." *Sumners v. Serv. Vending Co.,* 102 S.W.3d 37, 41 (Mo.App. S.D.2003). Generally speaking, therefore, if a contract contains mutual promises, such that a legal

duty or liability is imposed on each party as a promisor to the other party as a promisee, the contract is a bilateral contract supported by sufficient consideration. *Id.*

The Program states that "[t]he consideration for the execution of this agreement is the mutual exchange of promises and employment or the confirmation of employment." The Program thus suggests two independent sources of consideration—mutual promises and the continuation of at-will employment.

■■■■ On appeal, Speedway has not asserted that the continuation of at-will employment constitutes consideration for Kimberly's waiver of her right to access to the courts. Such an argument would have been ineffective, in light of *Morrow.* As with the DRP, the Program expressly states it does not alter the fundamental component of the at-will employment relationship—the ability to quit or be fired at anytime for any reason. As with the DRP, the Program expressly states that an employee's decision to continue employment following adoption of the Program evidences an agreement to be bound by the Program. "Employment at-will is not a *legally enforceable employment relationship* because it is terminable at the will of either party on a moment-by-moment basis." *Morrow,* 273 S.W.3d at 26. Because " 'an essential element to an employment contract is a statement of duration,' " and Speedway neither gave its employees a specific duration nor placed limitations on discharge following implementation of the Program, the mere continuation of at-will employment provided no consideration for

completing on-line training. We do not know why Speedway has taken the position on appeal that Kimberly signed the Program by signing a single page Acknowledgement ten months before the Program was adopted, particularly when this same allegation was not made to the trial court.

**15.** We recognize there are exceptions to this principle, including certain equitable doctrines such as detrimental reliance, but there are no exceptions involved here.

Speedway's employees' waiver of the right to access to the courts. *Id.* (*quoting Luethans v. Wash. Univ.*, 894 S.W.2d 169, 172 (Mo. banc 1995)).

On appeal, Speedway relies on the second component of "consideration" stated in the Program—"the mutual exchange of promises." Speedway claims in its brief that the Program was supported by Speedway's mutual promise to be "bound by the terms of the Program." Speedway's brief does not clearly explain what Speedway means by this assertion and does not identify the provision of the Program on which Speedway relies to make this assertion. We note that Speedway's mutual promise to be "bound by the terms of the Program" could mean two entirely different things. The promise to be bound by the Program could mean that Speedway promised to submit any disputes it had against employees to the dispute resolution procedures described in the Program—in other words that Speedway had the mutual obligation to submit claims to arbitration.[16] Conversely, the promise to be bound by the Program could simply mean that Speedway promised to cooperate with any employee who submits a dispute against Speedway to the Program and promised to be bound by the resolution of that employee's dispute reached through the Program.

When asked at oral argument to explain what it meant by its contention that its mutual promise was that it was "bound by the Program," Speedway claimed that it had the mutual obligation to submit its claims to the Program. However, our review of the Program suggests otherwise.[17] We conclude that the Program simply obligated Speedway to cooperate with employees who use the Program and to be bound by the resolution of employee disputes with Speedway reached through the Program.

The Program includes numerous provisions which support this conclusion. These provisions discuss only an ***employee's*** obligation to submit claims to the dispute resolution process described in the Program. For example, the Program provides: [18]

> The product of this effort is a new Dispute Resolution Program which will be effective 1 March 2004, and ***will apply to all potential employee disagreements*** within the Company, including those involving legal disputes (e.g., claims of discrimination, wrongful discharge, harassment, etc.).
>
> . . . .
>
> Our hope is that ***no employee*** will experience a serious problem with the Com-

---

16. The Missouri Supreme Court has held that mutuality of promise is determined by looking at an agreement as a whole. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 858 (Mo. banc 2006). Mutuality of a particular obligation in a contract is not required. *Id.* at 859. "[G]iven Missouri's preference for the arbitrability of disputes, a rule of contract construction that would be an exception to the general rules of contract construction and that would make arbitration less likely should not be erected." *Id.* at 858–59 (internal citation omitted). Thus, it is not necessary for a contract to arbitrate to impose a mutual obligation on both parties to arbitrate in order to be enforceable so long as consideration is otherwise provided. *Id.*

17. *Morrow* was not decided until after the parties argued Speedway's motion to compel to the trial court. Thus, there was no discussion of "mutual promises" or of what Speedway believed it was bound to do under the Program during oral argument on the motion to compel. However, *Morrow* was provided to the trial court after oral argument on the motion to compel. We presume, therefore, that the trial court considered *Morrow* and reviewed the Program, as we have, to determine whether the Program could be distinguished from *Morrow*.

18. The passages cited are but a representative sampling and are not exhaustive of other similar passages in the Program.

pany. However, *should you have a future disagreement* related to your employment, *we hope that you will take full advantage* of the new Program.

. . . .

Effective 1 March 2004, *all employee disputes* will be referred for resolution through the Company Dispute Resolution Program.

. . . .

If *you are unable to resolve a dispute with your employer* Company in-house, through Options 1 and 2, under the terms of the Programs the dispute will be submitted to mediation and/or to binding arbitration. . . . If legal action is instituted, the court will be requested to refer the matter to the Dispute Resolution Program for final resolution.

. . . .

9. Exclusive Remedy

A. Proceedings under the Plan shall be the exclusive, final and binding method by which Disputes are resolved. Consequently, *the institution of a proceeding under this Plan shall be a condition precedent to the initiation of any legal action . . . against the Company.*

. . . .

THE ALTERNATIVE DISPUTE RESOLUTION PROGRAM IN DETAIL

I. OPTION ONE—THE OPEN DOOR POLICY

The Open Door Policy guarantees that *all doors are open to you within the Company.* It *offers you a variety of ways in which you can solve your problem* . . . . Although *you are encouraged to solve your problem at the lowest possible level, you may take it as far* up the Chain of Command as needed.

. . . .

Immediate Supervisor—Whenever possible, *you should try to resolve any problems at work with your immediate supervisor.*

. . . .

Higher Level of Supervision—. . . If *you are unsatisfied with your immediate supervisor's response* or need to talk to someone other than your supervisor, *you may take your problem to the next higher level of supervision.*

. . . .

II. OPTION TWO—THE INFORMAL CONFERENCE

*You will be able to resolve most routine problems within the Company* through the Chain of Command. If it does not produce results, however, *you can sit down at a conference with a Speedway Auto Group representative to see if you can agree on what to do next.*

. . . .

III. OPTION THREE–MEDIATION

If *your dispute* is based on legally protected rights, *you may feel an outside process, such as mediation, is necessary to resolve it. For many people, just presenting their case to someone outside the Company* who is not involved in their problem is all that is needed to break a stalemate.

. . . .

Requesting Mediation

*You must pay* a $125.00 processing fee *to take your legal dispute* to an outside resolution process, such as mediation. . . . *Once you have made this request and paid your fee, Speedway Auto Group will participate with you* in the mediation process.

. . . .

Typical Mediation Steps

. . . .

Mediation is almost always successful in *helping you reach a settlement.* If not, *you or the Company may wish to*

*take your dispute to arbitration for a final and binding decision.*

. . . .

### IV. OPTION FOUR—ARBITRATION

If the dispute involves a legally protected right, *such as protection against age, race, sex discrimination, sexual harassment or claims for retaliation*[19] and has not been resolved in Options One, Two or Three, you or the Company may request arbitration. *While you do not have to proceed through each of the options in their exact numerical order,* the Program is designed with multiple steps to maximize the possibility of resolution prior to Option four.

. . . .

Requesting Arbitration

*You must pay* a $125.00 processing fee *to take your legal dispute* to an outside resolution process, such as arbitration. . . . *Once you have made this request and paid your fee, Speedway Auto Group, is legally bound to participate with you in the arbitration process.*

. . . .

Acknowledgement

I _____ hereby acknowledge that my employer, Speedway Auto Group has instituted a Dispute Resolution Plan . . . .

. . . .

_____

*Print Employee Name*

_____

*Employee Signature*

(All bold and italicized passages are emphasis added.)

These provisions (along with numerous others provisions not cited) universally address *employee* claims and disputes and the manner in which *those* disputes are to be maneuvered through the four-option

dispute resolution process. However, there are no corollary provisions in the Program addressing disputes Speedway has with its employees or addressing the manner in which Speedway is to present those claims through the four-option dispute resolution process.

The Program does provide that "[e]ffective 1 March 2004, *all employee disputes* will be referred for resolution through the Company Dispute Resolution Program. *This means that* after 1 March 2004, *both you and your Employer Company will be bound to use the Dispute Resolution Program* as the primary and sole means of dispute resolution." (Emphasis added.) The second sentence of this provision appears to be the likely source for Speedway's claim during oral argument that it was "mutually bound" to submit claims against employees to arbitration. However, that is not what the second sentence says. Instead, by its express use of the phrase "[t]his means," the second sentence merely clarifies the first sentence—a sentence which unambiguously discusses *"employee* disputes." Read together, these two sentences say nothing more than that Speedway is bound to participate with an employee who submits his or her dispute to the Program.

This conclusion is supported by other language in the Program. For example, the Program provides that Speedway will train its managers and supervisors to assist in resolving *employee* concerns and will assure that management will understand its role in resolving the *employee's* workplace disputes. The Program provides that once an *employee* requests either mediation or arbitration and pays the required fee, Speedway will be obligated to participate. The Program's signature block includes a place for the *employee* to sign acknowledging the waiver of his or

---

**19.** Such claims are, by their nature, always claims asserted by an employee.

her right to access the courts. There is no place for Speedway to sign.

If Speedway had intended to implement a dispute resolution process that bound Speedway to submit its claims against employees to arbitration, then it could have easily done so. It did not. We conclude that Speedway has not promised to submit its claims against employees to the Program.[20] Indicative of this conclusion is the fact that Speedway did not use the Program to address or to attempt to resolve its disputes with Kimberly later embodied in its counterclaim, electing instead to fire Kimberly without any process when it believed it was aggrieved by her actions.

Though we conclude that Speedway did not promise to submit its claims against employees to arbitration, Speedway's promise to be "bound to use the Program" must have some meaning. We construe this provision as nothing more than Speedway's promise to participate with employees who submit their disputes to the Program. This "promise" is identical to the promise Hallmark claimed to have made to its employees in the DRP. *Morrow,* 273 S.W.3d at 25. We did not determine in *Morrow* whether such "so-called 'promise[s]'" constitute a mutual promise sufficient to provide consideration for an employee's waiver of the right to access to the courts. *Id.* Nor do we need to resolve that question here.[21] As in *Morrow,* Speedway's "promise" to be bound by the Program should an employee submit a dispute through the Program is illusory because of Speedway's unilateral right to amend the Program. *Id.*

### Unilateral Right to Modify

A contract that purports to exchange mutual promises will be construed to lack legal consideration if one party retains the unilateral right to modify or alter the contract as to permit the party to unilaterally divest itself of an obligation to perform the promise initially made.

[A] promise *is not* good consideration unless there is mutuality of obligation, so that each party has the right to hold the other to a positive agreement. Mutuality of [obligation] means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, *neither party is bound unless both are bound.*

*Morrow,* 273 S.W.3d at 30 (Ahuja, J. concurring) (second emphasis added) (*quoting Sumners v. Serv. Vending Co.,* 102 S.W.3d 37, 41 (Mo.App. S.D.2003)).

Thus, a purported agreement may include "mutual promises" sufficient to suggest mutuality of contract and thus legal consideration. However, if the agreement also includes language permitting one party to unilaterally modify the agreement such that the party could relieve itself of its promises, there is no meaningful mutuality at all, and the contract is illusory and unenforceable. *Am.*

---

**20.** At most, Speedway could argue that the Program is ambiguous with respect to this claimed promise. However, even if we believed the Program to be ambiguous (which we do not), general principles of contract construction would not permit us to interpret the Program to find that Speedway made a mutual promise to submit its claims against employees to arbitration. *Transit Cas. Co. in Receivership v. Certain Underwriters at Lloyd's of London,* 963 S.W.2d 392, 398 (Mo.App. W.D.1998) (finding that in construing an arbitration agreement, "courts construe ambiguities in contracts against those who draft them").

**21.** Though we need not resolve the question here, we do question whether an employer's "promise" to be bound by an employee's use of a dispute resolution program that the employer has required the employee to use is a mutual promise sufficient, standing alone, to provide legal consideration for the employee's waiver of the right to access to the courts.

*Laminates, Inc. v. J.S. Latta Co.*, 980 S.W.2d 12, 23 (Mo.App. W.D.1998) ("Retaining the right to cancel a contract or to avoid one's promise is an unenforceable, illusory promise."). A contract is illusory where a party "had it always in his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promisee." *Cooper v. Jensen*, 448 S.W.2d 308, 314 (Mo.App. 1969).

In *Morrow*, Hallmark's ability to avoid its claimed contractual obligations via its right to unilaterally amend the DRP rendered the DRP an illusory and unenforceable contract to arbitrate. 273 S.W.3d at 18. We were particularly concerned in *Morrow* that Hallmark's unfettered right could be employed to modify or terminate the DRP even to the detriment of known claims or pending arbitration proceedings. *Id.* at 25. Speedway argues that unlike *Morrow*, its right to amend the Program is subject to two limitations—any amendment to the Program can only be prospective in its application, and Speedway's employees must be advised about an amendment in writing. Speedway thus argues that its right to amend the Program does not render its promise to be bound by the Program illusory.

Notwithstanding Speedway's contention, we note that the Program's provisions on the subject of notice to employees are inconsistent. On the second page of the Program, it states that "the terms can only be modified by *providing notice of the change to employees in writing.*" (Emphasis added.) Here, there is no mention that modifications will be given only prospective application. In paragraph 5, titled "Amendment," the Program provides "[t]his Plan may be amended by Sponsor at any time. However, *no amendment shall apply to a Dispute of which Sponsor had actual notice on the date of amendment.*" (Emphasis added.) Here, there is no mention that notice of the amendment must be provided to the employees.

Even assuming these inconsistencies can be reconciled, Speedway cites no authority for the proposition that the limits it has imposed on its power to amend the Program are sufficient to prevent its promise to be bound by the Program's terms from being rendered illusory. Speedway incorrectly claims that *Morrow* stands for this proposition. In *Morrow*, Hallmark argued that its unfettered right to amend the DRP should be construed by this court as having only prospective application. 273 S.W.3d at 25. Though we characterized Hallmark's appellate concession as "worthy," we did not hold that the concession carried with it any legal significance in evaluating the mutuality of promises contained in the DRP. *Id.* In fact, we subsequently characterized Hallmark's offer as a "gratuitous gesture," a phrase synonymous with "worthy," suggesting we were merely acknowledging the "benevolence" of Hallmark's argument. *Id.*

Though Speedway did not do so, we have located cases which hold that limiting an employer's unilateral right to amend an arbitration agreement to amendments that are prospective in application and about which employees have been afforded reasonable advance notice may prevent an employer's mutual promise from being rendered illusory. In *Pierce v. Kellogg, Brown, Root, Inc.*, the court concluded that a dispute resolution program was supported by sufficient consideration in the form of the parties' mutual promises to forego litigation of their disputes where the agreement provided any amendment by the employer would not be effective as to disputes "for which a proceeding has been initiated pursuant to the Rules." 245 F.Supp.2d 1212, 1215–16 (E.D.Okla.2003) (*citing Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir.2002)). In addition,

the arbitration agreement conditioned the effectiveness of amendments on "giving at least 10 days notice to current Employees." *Id.* The court found "[t]his prospective application of the amendment ... *when combined with the ten-day notice provision,* constitutes a significant limitation on KBR's right to modify, amend or cancel such that the agreement to arbitrate is not an illusory one." *Id.* (emphasis added). In *Batory v. Sears, Roebuck & Co.,* the court found a mutual promise to submit to arbitration was not illusory where "Sears' discretion to modify the DRP is limited in two important respects: It must provide employees 60 days' notice of termination or any modification, *and* it cannot modify the DRP with respect to a previously submitted claim." 124 Fed. Appx. 530, 534 (9th Cir.2005) (emphasis added). *See also Zamora v. Swift Transp. Corp.,* 547 F.Supp.2d 699, 703 (W.D.Tex. 2008) ("If a party possesses the right to modify or terminate an arbitration agreement *without notice,* its promise is illusory, and the agreement is unenforceable."); *Holloman v. Circuit City Stores, Inc.,* 162 Md.App. 332, 873 A.2d 1261, 1264–66 (Md. Ct.Spec.App.2005) (finding that arbitration agreement allowing employer to modify agreement upon thirty days notice to employee was supported by consideration).

These cases suggest that the right to amend prospectively, if coupled with advance notice of the amendment, may prevent the right to amend from rendering a mutual promise illusory. We need not decide, however, whether the unilateral right to amend an agreement on mere advance notice, without requiring mutual consent, or without affording recourse to the non-amending party if the amendment is not acceptable, comports with settled principles of contract law in Missouri as the Program *does not* require Speedway to provide its employees any *advance* notice of an amendment.[22] The Program only requires Speedway to report amendments to employees in writing, a notification which can be provided *after* an amendment has already been adopted. Even then, the Program does not require Speedway to provide employees with notice of an amendment within a set time following the amendment's adoption, meaning Speedway could provide written notice of an amendment days, weeks, months, or years after the amendment has taken effect without running afoul of the Program's terms.

We find, therefore, that Speedway's argued limitations on its right to amend the Program are not sufficient to avoid rendering Speedway's claimed mutual promise to be bound by the Program's terms illusory.

The Program is not supported by legal consideration and is not an enforceable contract to arbitrate.[23] Because we have determined that the Program is not a valid and enforceable contract to arbitrate, we need not address the secondary argument raised by Speedway that the Program is not an unconscionable arbitration agreement. As previously noted, the dis-

**22.** The Program does require Speedway to provide its employees ten days' advance notice of termination of the Program in its entirety.

**23.** *Morrow* drew no conclusion about an employer's ability to insist on compliance with the DRP as a term or condition of employment and not as an enforceable contract against an at-will employee *during* the course of the employee's employment. *Morrow* also drew no conclusion about whether the DRP would be viewed differently if sought to be enforced against an individual advised of the DRP while a *prospective* employee and thus prior to the decision to accept employment. As in *Morrow,* the case *sub judice* involves a claim asserted by an at-will employee following termination of employment, and a Program which was not adopted until after the employee's at-will employment commenced. We reserve these open questions, therefore, for discussion in an appropriate case.

cussion of procedural and substantive unconscionability is only relevant in discussing the third factor a court must review in considering a motion to compel arbitration—whether a *valid* contract to arbitrate is subject to revocation because it is unconscionable. Because we have determined that a valid contract to arbitrate was never formed, we need not address whether the Program, if valid, could be subject to revocation as unconscionable.[24] Point One is denied.

### Point Two

In its second point, Speedway contends that it did not waive its right to enforce the provisions of the Program requiring arbitration of Kimberly's claims. We disagree. Had we concluded that the Program was an enforceable contract, we would nonetheless find that Speedway waived its right to enforce the Program against Kimberly.

"A party may waive a valid arbitration agreement." *Major Cadillac, Inc. v. Gen. Motors Corp.*, 280 S.W.3d 717, 721 (Mo.App. W.D.2009). " 'A party waives its right to arbitrate if it: (1) had knowledge of the existing right to arbitrate; (2) acted inconsistently with that right, and (3) prejudiced the party opposing arbitration.' " *MFA*, 303 S.W.3d at 624–25 (*quoting Major Cadillac*, 280 S.W.3d at 721).

Here, Speedway concedes that it had knowledge of its purported right to insist on arbitration of Kimberly's claim pursuant to the Program. In fact, the Program expressly provides that "[i]f legal action is instituted, the court will be requested to refer the matter to the Dispute Resolution Program for final resolution." Speedway contends, however, that it did not act in a manner inconsistent with the right to enforce arbitration and that Kimberly was not in any case prejudiced. We disagree.

Speedway acted inconsistently with a right to enforce arbitration of Kimberly's claims. After Kimberly filed her petition against the Defendants, Defendants removed the case to the federal court. After the case was remanded following the filing of an amended petition, the Defendants each filed answers, none of which asserted as a defense the obligation to arbitrate. In addition, Speedway filed a counterclaim alleging fraud, breach of fiduciary duty, and civil conspiracy, seeking actual and punitive damages, all claims which were clearly within the scope of the Program. The counterclaim necessitated the filing of a reply by Kimberly. Then, following an eleven month delay were no apparent action was being taken in the case, Kimberly was required to propound discovery on the Defendants to move the litigation along. Then and only then did the Defendants file a motion to compel arbitration. Speedway's actions, along with the delay in asserting its claimed right to compel arbitration, are indicative of a desire to adjudicate, at least for a time, and are clearly inconsistent with a right to arbitrate. *See, e.g., Major Cad-*

---

**24.** To avoid later confusion, we do observe that the same evidence may be relevant in determining whether a mutual promise is illusory as to render an arbitration agreement an unenforceable contract, and in determining whether an otherwise enforceable contract to arbitrate should be revoked because it is procedurally and substantively unconscionable. By way of example, had Speedway made a valuable promise in the Program to its employees that could not be unilaterally modi-fied, we may have found the Program to be a valid and enforceable contract. However, we would still consider the fact that Speedway was not mutually bound to submit its claims to arbitration and the fact that Speedway could unilaterally modify other provisions of the Program without advance notice to employees as relevant in assessing whether the contract is subject to revocation because it is unconscionable.

*illac*, 280 S.W.3d at 722 ("GM acted inconsistently with a right to arbitrate when it removed the case to federal court, requested a change of circuit court judge, and filed motions to dismiss in the federal court and the circuit court."); *MFA*, 303 S.W.3d at 625 ("MFA undoubtedly acted inconsistently with its right to arbitrate by filing its third party action against HLW . . ., waiting nineteen months to dismiss its action, and not notifying HLW of its intent to pursue arbitration until after HLW had prevailed in its summary judgment motion against [another party].").

■ Though the first two prongs to establish waiver are established, a court cannot find waiver without first finding prejudice, and the burden of showing prejudice is on the party seeking waiver. *Mueller v. Hopkins & Howard, P.C.*, 5 S.W.3d 182, 187 (Mo.App. E.D.1999). "Delay in seeking to compel arbitration does not itself constitute prejudice; but delay and the moving party's trial-oriented activity are material factors in assessing prejudice." *Id.* "Prejudice is determined on a case-by-case basis." *Major Cadillac*, 280 S.W.3d at 723.

In this case, Speedway did not assert a right to compel arbitration until it had engaged in significant trial-oriented activities including an effort to change the forum of Kimberly's suit to federal court, the filing of an answer that did not raise the obligation to arbitrate, and the assertion of a substantial counterclaim. Kimberly was required to file a reply, thus incurring expense to defend Speedway's counterclaim. Kimberly also incurred expense when she was required to initiate substantial discovery on the Defendants to advance her claims after nearly eleven months of no activity. Further, the three month delay between the filing of Kimber-

ly's lawsuit and removal of the case to federal court was due to Speedway's unsuccessful pursuit of a substantive motion to dismiss in Larry's case based on Larry's and Kimberly's joint bankruptcy filings. Speedway conceded at oral argument that had the motion to dismiss been successful in Larry's case, a similar motion would have been filed in Kimberly's case. Though Speedway's motion to dismiss was not "trial-oriented activity" occurring directly in Kimberly's case, there is no contest that the activity was in part intended to substantively impact Kimberly's case. We have no difficulty concluding on this record that prejudice was sufficiently established. *MFA*, 303 S.W.3d at 625 (finding prejudice was sufficiently established where the party asserting arbitration waited nineteen months to do so and in the interim asserted affirmative claims against the party suggesting waiver).

Speedway waived any right it may have had to insist on arbitration of Kimberly's claims pursuant to the Program. Point Two is denied.

### Conclusion

We affirm the trial court's order denying Speedway's motion to compel arbitration.

All concur.