

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| CHRISTA REED, | ) |
| | ) WD79371 |
| Appellant, | ) |
| v. | ) OPINION FILED: |
| | ) |
| THE CURATORS OF THE | ) November 15, 2016 |
| UNIVERSITY OF MISSOURI, ET | ) |
| AL., | ) |
| | ) |
| Respondents. | ) |

### Appeal from the Circuit Court of Boone County, Missouri
### Honorable Jodie Asel, Judge

### Before Division One:  Thomas H. Newton, P.J.,
### Cynthia L. Martin, and Edward R. Ardini, Jr., JJ.

Ms. Christa Reed appeals a judgment denying her claim for wrongful discharge in violation of public policy based on breach of contract and tortious interference with business expectancy.[1]  This claim was resolved after the trial court sustained the motion for directed verdict filed by the Curators of the University of Missouri (University) and Drs. Elizabeth Giuliano and Jacqueline Pearce.  We affirm.

The University employed Ms. Reed from January 2004 to March 2011 as a veterinary technician, serving in multiple departments at the MU Veterinary Health

---

[1] At trial claims of a Missouri Human Rights Act violation, defamation, and violations of the U.S. constitution were also addressed, however, these issues are not on appeal.

1

Center (VHC). Ms. Reed worked in the VHC's radiology service from 2004-2006, transferring to the ophthalmology service in November 2006.

As an employee in the ophthalmology service, her chain of command included Department Chair Dr. John Dodam, VHC Director, Dr. David Wilson, VHC Administrator, Mr. Ron Haffey, Professor of Ophthalmology, ophthalmology section leader, Dr. Elizabeth Guiliano, and Assistant Professor of Ophthalmology, Dr. Jacqueline Pearce. Dr. Dodam oversaw the faculty clinicians, including Drs. Giuliano and Pearce. Dr. Wilson and Mr. Haffey were responsible for hiring, firing, and disciplining VHC staff employees. Ms. Reed was supervised by the ophthalmology clinicians on her service including Drs. Giuliano and Pearce, who directed her work and provided her performance evaluations.

Each year, Ms. Reed was evaluated by all of the ophthalmology service's faculty and resident clinicians. In January 2009, Ms. Reed received an average score of 3.2 out of 4, containing mixed comments and suggestions for improvement. In February 2010, Ms. Reed received an average score of 2.7 out of 4 on her annual evaluation for the 2009 calendar year. She again received mixed remarks. Ms. Reed's 2009 evaluation documented an unexpected "subtle decline" in her performance. In May 2010, a "precipitous decline" was noticed.

The May 2010 evaluation noted numerous performance issues that had previously been raised. When she received this review she was also notified that she had been placed on a six-month probation to allow her to correct the identified deficiencies. In October 2010, at the conclusion of her probation, Ms. Reed's progress had not improved. Because she had not been evaluated during her probation, she was

2

issued a written review that her probation was extended until January 2011. The written notice identified previously noted deficiencies.

In mid-February 2011, Ms. Reed received a two-day suspension for failing to improve her performance by the end of her review period. Ms. Reed's poor performance continued after her suspension, and she was terminated on March 3, 2011, for unsatisfactory performances and unprofessional behavior.

From November 2010 through March 2011, Ms. Reed filed a series of internal grievances, three of which alleged that her suspension and termination were executed in retaliation for her reports of "potential fiscal irregularities" related to the ophthalmology service.

After her termination, Ms. Reed filed suit against the University and Drs. Giuliano and Pearce. Ms. Reed's lawsuit asserted five counts: Wrongful Discharge in Violation of Public Policy Based on Breach of Contract (Count I) against all defendants, Tortious Interference with a Business Expectancy (Count II) against Drs. Giuliano and Pearce, and Violations of the Missouri Human Rights Act (Count III) on the basis of age against all defendants.[2] At the close of Ms. Reed's evidence, the trial court granted defendants' motion for directed verdict on her wrongful discharge and tortious interference claims. At the conclusion of trial, the jury returned unanimous verdicts for all defendants on Ms. Reed's remaining Missouri Human Rights Act claim. The trial court overruled Ms. Reed's motion for a new trial. This appeal follows.

**Legal Analysis**

In reviewing the grant of a motion for directed verdict, this Court "must determine whether the plaintiff made a submissible case..." *Dunn v.*

---

[2] The court had previously dismissed Count IV, Defamation as to Dr. Giuliano, and deemed Count V, alleged constitutional violations against Drs. Giuliano and Pearce, abandoned.

*Enter. Rent-A-Car Co.,* 170 S.W.3d 1,3 (Mo. App. E.D. 2005). "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Investors Title Co., Inc. v. Hammonds*, 217 S.W.3d 288, 299 (Mo. banc 2007). "An appellate court views the evidence in the light most favorable to the plaintiff to determine whether a submissible case was made…" *Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 13 (Mo. banc 1994). "The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred." *Morrison v. St. Luke's Health Corp.,* 929 S.W.2d 898, 900 (Mo. App. E.D. 1996). "Whether the plaintiff made a submissible case is a question of law subject to de novo review." *D.R. Sherry Const., Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. banc 2010). Further, with respect to evidentiary rulings, the trial court "enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *State v. Mayes*, 63 S.W.3d 615, 629 (Mo. banc 2001).

*Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011).

## Count I

In three of her four points, Ms. Reed asserts that the trial court erred in granting the University's motion for a directed verdict on her claim of wrongful discharge in violation of policy based on breach of contract. Because these issues are so closely related, we will address them together.

"Under Missouri's employment at-will doctrine an employer can discharge—for cause or without cause—an at-will employee who does not otherwise fall within the protective reach of a contrary statutory provision and still not be subject to liability for wrongful discharge. *Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. banc 1985). Unless a claim is based on a statute, an at-will employee must plead offer, acceptance, and bargained for consideration. *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662-63 (Mo. banc 1988) ("Absent a valid contract of employment between the parties, plaintiff as an at will employee could be discharged for cause or without cause.").

4

"Without a statement of duration, an employment at will is created which is terminable at any time by either party with no liability for breach of contract." *Luethans v. Washington Univ.*, 894 S.W.2d 169, 172 (Mo. banc 1995), *abrogated on other grounds by Keveney v. Mo. Military Acad.*, 304 S.W.3d 98 (Mo. banc 2010). "Alternatively, if there is not a specific duration expressed, the contract must be one that places limits on the employer's rights to discharge at will." *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 26 (Mo. App. W.D. 2008). Because of "its very moment-by-moment nature," at-will employment is not a legally enforceable employment contract. *Id.*

Because of the general language and the potential for alteration at any time, an employee handbook cannot reasonably be interpreted to alter an at-will employment arrangement. *Johnson*, 745 S.W.2d at 662. Property interests in one's continued employment "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—*rules or understandings* that secure certain benefits and that support claims of entitlement to those benefits.'" *Daniels v. Bd. of Curators of Lincoln Univ.*, 51 S.W.3d 1, 7 (Mo. App. W.D. 2001)(quoting *Bd. Of Regents of State College v. Roth*, 408 U.S. 564, 577 (1972)). "Missouri has held that if there is a property interest established, the employee is entitled to notice of the reasons for dismissal and an opportunity to be heard prior to having his employment interrupted. The opportunity to be heard must be at a meaningful time and in a meaningful manner." *Id.* "'A property interest in employment can also be created by implied contract arising out of customs, practices and defacto policies.'" *Id.* at 8. (quoting *Winegar v. Des Moines Indep. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994)).

5

The at-will doctrine is, however, limited in two respects. "An employer cannot terminate an at-will employee for being a member of a protected class, such as 'race, color, religion, national origin, sex, ancestry, age or disability.'" *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 346 (Mo. banc 2010) (quoting Section 213.055 RSMo. Supp. 2005). The at-will doctrine is also limited by a "public-policy exception." *Id.* The public-policy exception is narrowly tailored and prevents the termination of an at-will employee "for refusing to perform an illegal act or reporting wrongdoing or violations of law to superiors or third parties." *Id.* "[A] wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body. Absent such explicit authority, the wrongful discharge action fails as a matter of law." *Id.* "'The mere citation of a constitutional or statutory provision in a [pleading] is not by itself sufficient to state a cause of action for retaliatory discharge, the plaintiff must demonstrate that the public policy mandated by the cited provision is violated by the discharge.'" *Id.* at 347 (quoting 82 An. Jur. 2d § 61). Thus, to prevail on a whistleblowing claim, the plaintiff must demonstrate that he "'reported to superiors or to public authorities *serious* misconduct that constitutes a violation of law and of…*well-established* and *clearly mandated* public policy.'" *Id.* (quoting *Lynch v. Blanke Vaer & Bowey Krimko, Inc.,* 901 S.W.2d 147, 150 (Mo. App. E.D. 1995)).

### Sovereign Immunity for Claims Based in Tort

Ms. Reed asserts that the trial court erred in granting the University's motion for a directed verdict on Count 1 because it found that Ms. Reed's claim was a tort. Ms. Reed asserts that the University was not entitled to sovereign immunity because her

6

claim "was based on an express contractual agreement between her and her employer that it would not retaliate against her if she reported misconduct in good faith." We disagree.

If an employer terminates an employee for either of the two recognized exceptions to the at-will employment doctrine, "the employee has a cause of action in tort based on the public-policy exception." *Fleshner v. Pepose Vision Inst., P.C.,* 304 S.W.3d 81, 92 (Mo. banc 2010). "The Curators of the University of Missouri 'is "a public entity with the status of a governmental body and, as such, is immune from suit for liability in tort in the absence of an express statutory provision."'" *Langley v. Curators of Univ. of Mo.*, 73 S.W.3d 808, 811 (Mo. App. W.D. 2002) (quoting *Brennan by & through Brennan v. Curators of the Univ. of Mo.,* 942 S.W.2d 432, 434 (Mo. App. W.D. 1997) (quoting *Krasney v. Curators of Univ. of Mo.*, 765 S.W.2d 646, 649 (Mo. App. W.D. 1989))).

At trial, Ms. Reed disclaimed the tortious nature of her claims, instead arguing that she may skirt sovereign immunity because this is a wrongful termination in violation of a public policy as a contract.[3] In making this assertion, Ms. Reed relies on *Holmes v. Kansas City Bd. of Police Comm'rs*, 364 S.W.3d 615 (Mo. App. W.D. 2012). In *Holmes,* the plaintiff alleged that he suffered retaliation for whistleblowing. *Id.* at 624-26. Although this Court acknowledged that sovereign immunity does not apply to breach of contract suits, the plaintiff's claim was denied because "we cannot find it was submitted as a claim in contract rather than a claim in common-law tort." *Id.* at

---

[3] Specifically, Ms. Reed asserts, "[t]his is not a breach of an employment contract. This is a breach of a promise, for a promise contained in their anti-retaliation practices. It's not precatory, it's not wishful, it's not aspirational. It's clear retaliation and will not be tolerated."

7

625. Therefore, Ms. Reed asserts that this case "opened the door and the possibility that if [the claim is] pled as a contract and it's presented as a contract in the verdict director, it is a contract and skirts the sovereign immunity."

Ms. Reed, however, has failed to demonstrate the essential elements of a contract. *See Holmes*, 364 S.W.3d at 624 ("[A] claim for breach of contract requires: '(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff.'"). In her amended petition, Ms. Reed specifically states that her position was one of at-will employment.[4] Count 1 of her petition asserts a claim of wrongful discharge. Thus, the facts alleged in Ms. Reed's petition clearly highlight the disposable nature of her employment. *See Dake,* 687 S.W.2d at 193 (Missouri law has consistently held that an at-will employee can be terminated for any reason and an employer cannot be held liable for a claim of wrongful discharge.); *see also Luethans,* 894 S.W.2d at 172 ("'Without a statement of duration, an employment at will is created which is terminable at any time by either party with no liability for breach of contract.'") (quoting *McCoy v. Spelman Memorial Hosp.*, 845 S.W.2d 727, 730 (Mo. App. 1993)). Further, regardless of Ms. Reed's failure to prove a valid employment contract, Ms. Reed did not have explicit authority as a basis for her alleged wrongful discharge and, thus, fails as a matter of law. *See Margiotta*, 315 S.W.3d at 346 ("[A] wrongful discharge action must be based on a constitutional

---

[4] Ms. Reed also contends that, because an employee handbook can create a protected property interest for an at-will employee, the University's human resources policies can create binding contractual promises protecting an at-will employee from retaliation, relying on *Daniels v. Bd. of Curators of Lincoln Univ.*, 51 S.W.3d 1 (Mo. App. W.D. 2001). In *Daniels*, however, we noted that a protected property interest only entitled the plaintiff to due process in dismissal, an issue not on appeal in this case. *Id.* at 7. Therefore, this matter is not pertinent to the issue on appeal.

8

provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body. Absent such explicit authority, the wrongful discharge action fails as a matter of law."). Finally, at trial, counsel for Ms. Reed specifically stated that, "[t]his is not a breach of an employment contract." Therefore, because this is not a breach of contract claim, Ms. Reed's claims fall within the public-policy tort exception, under which the University has sovereign immunity. Point is denied.

**HR-520**

Ms. Reed also asserts that the trial court erred in granting the University's motion for a directed verdict on Count 1 by finding that University policy HR-520 did not contain specific binding promises because the parties' intent to enter into a contract and whether a promise not to retaliate is a binding obligation are questions for the fact-finder. We disagree.

"Contracts embody the intention of two or more parties to bind themselves legally to promises, and are often characterized by the concepts of mutual promises." *Morrow,* 273 S.W.3d at 22. "The essential elements of a valid contract include offer, acceptance, and bargained for consideration." *Johnson,* 745 S.W.2d at 662. A bilateral contract is one in which there are mutual promises between two parties. *Baier v. Darden Rests.*, 420 S.W.3d 733, 738 (Mo. App. W.D. 2014). "[I]f a contract contains mutual promises, such that a legal duty or liability is imposed on each party as a promisor to the other party as a promisee, the contract is a bilateral contract supported by sufficient consideration." *Frye v. Speedway Chevrolet Cadillac*, 321 S.W.3d 429, 438 (Mo. App. W.D. 2010). A promise is not sufficient consideration unless there is mutual obligation, meaning that "an obligation rests upon each party to do or permit to

9

be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." *Sumners v. Serv. Vending Co., Inc.,* 102 S.W.3d 37, 41 (Mo. App. S.D. 2003) (citation omitted).

"Under Missouri law, employee handbooks generally are not considered contracts because they normally lack the traditional prerequisites of a contract." *Johnson v. Vatterot Educ. Ctrs., Inc.,* 410 S.W.3d 735, 738 (Mo. App. W.D. 2013) (citation omitted). This is because employee handbooks are "self-imposed policies, providing a nonexclusive list of acts for which an employee might be subject to discipline." *Johnson*, 745 S.W.2d at 662. "Terms and conditions of at-will employment are not enforceable at law as *contractual duties*." *Morrow,* 273 S.W.3d at 26.

Here, Ms. Reed bases her breach of contract claim on her appointment notification and HR-520: Reporting University-Related Misconduct. Ms. Reed's signed appointment notification reflects her acceptance of an "Administrative, Service and Support" appointment as a Senior Veterinary Technician beginning in January 2004. The appointment notification also states:

> Please read this document carefully before signing it. This document and the Collected Rules and Regulations of the University of Missouri (Collected Rules) state the terms of your employment with the University of Missouri. To the extent conversations or other documents are inconsistent with this document or the Collected Rules, the Collected Rules followed by this document will govern…. All Administrative, Service and Support and academic administrative appointments, including, but not limited to Department Chair, Dean and Chancellor, are indefinite and may end at any time. I agree to accept the position on the terms specified above.

This language clearly forms an at-will employment relationship. *See Margiotta*, 315 S.W.3d at 345 ("Absent an employment contract with a 'definite statement of duration…an employment at will is created.'") (quoting *Luethans v. Washington Univ.,*

10

894 S.W.2d 169, 172 (Mo. banc 1995)). This document did not relay any clear or definite promises regarding the terms and conditions of Ms. Reed's employment. Instead, the appointment simply offered her an at-will employment along with the related unilaterally imposed terms and conditions. HR-520, at most, is one of the unilaterally adopted terms and conditions of employment. The language of HR-520 states:

**Summary**

Faculty, staff, and students are encouraged to make good faith reports of University-related misconduct. Retaliation as a response to such disclosure will not be tolerated.

**Reporting**

Information of University-related misconduct of illegal, improper or dishonest acts should be reported to an employee's supervisor or other University official or other reporting mechanism established by the University. Such acts would include, but not be limited to, corruption, burglary, theft of University property, fraud, coercion, discrimination, sexual harassment, civil rights violations, misuse of University property, and conflicts of interest. Remedies to address University-related misconduct may include termination of employment, requirement of restitution and presentation of such information to the appropriate authorities for criminal prosecution.

**Definition**

A good faith report is the disclosure of University-related misconduct made with a belief in the truth of the information which a reasonable person could hold based upon the facts. A disclosure is not made in good faith if made with knowledge of its falsity or reckless disregard of the facts. University-related misconduct includes any activity which affects the University by a University department or by any University employee which is in violation of any state or federal law or University policy, as described in more detail in the preceding section.

11

**Retaliation**

Any threat of or attempt to penalize or retaliate against an employee for filing a good faith report or participating in the investigation of a good faith report regarding University-related misconduct will be considered a separate and distinct violation of University policy.

To uphold her wrongful discharge claim, Ms. Reed needed to identify a clear, definite promise to modify her at-will employee status. *See Johnson*, 745 S.W.2d at 662. The language of HR-520 does not explicitly promise that employees would not be fired for reporting University misconduct. Instead, the language simply explains the University's general policy toward misconduct reports. The language of HR-520, does not "require" an employee to report misconduct. The policy language did not expose Ms. Reed to any legal duties or liabilities. Instead, it explains that employees are simply "encouraged" to report misconduct. Therefore, the policy language does not provide a specific binding promise, meaning a bilateral contract does not exist, because there is not sufficient consideration of mutual promises. Instead, HR-520 is nothing more than a term of Ms. Reed's employment that neither party had a right to legally enforce. *Morrow*, 273 S.W.3d at 26-27 ("[T]he only legally enforceable promise created out of at-will employment is the employer's promise, whether express or implied, to pay the employee for the work performed by the employee. The employer can enforce, through employee discipline, many different conditions of employment; but the employer has no legal cause of action for breach of contract.").

Further, even if the terms and conditions outlined in HR-520 attempted to alter Ms. Reed's status as an at-will employee, the alteration is voided through the language of the Appointment Notification (which created an at-will employment relationship), stating, "[t]o the extent conversations or other documents are inconsistent with this

12

document or the Collected Rules, the Collected Rules followed by this document will govern." Therefore, even if HR-520 attempted to create an employment relationship—which it did not—the language of the appointment notification corrects the ambiguity, resolving it in favor of at-will employment. *See Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 838 (Mo. App. W.D. 2004) ("'[A]mbiguity depends on context. Contract language is not interpreted in a vacuum, but by reference to the contract as a whole.'") (quoting *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973)). Point denied.

**Rule 72.01(a)**

In the fourth and final point, Ms. Reed asserts that the trial court erred in granting the University's motion for a directed verdict on Count 1 because the motion was insufficient to present a basis for relief in the trial court by failing to state the specific grounds as required by Rule 72.01(a).[5] We disagree.

Rule 72.01(a) states:

> A party may move for a directed verdict at the close of the evidence offered by an opponent. The filing of such motion does not constitute a waiver of movant's right to offer evidence to the same extent as if the motion had not been made. A motion which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

A motion for directed verdict must contain more than "boilerplate generalities" to effectively comply with Rule 72.01. *See Pope v. Pope*, 179 S.W.3d 442, 452 (Mo. App. W.D. 2005) (Where this Court en banc held that a motion containing no specific

---

[5] Rule references are to Missouri Supreme Court Rules of Civil Procedure (2015), unless otherwise indicated.

13

grounds relating to the sufficiency of the evidence regarding a partnership and the consequent vicarious liability was insufficient because the motion contained only general language. For example, the first assertion in the challenged motion stated, "Plaintiff has failed to prove a submissible case against this Defendant." The claims failed to even include the word "partnership," which was the main issue of the case. Further, defense counsel decided not to orally elaborate on the basis for the general claims when invited.). Further, when considering a motion for directed verdict, the motion may be considered together with arguments of counsel. *Wadlow v. Lindner Homes, Inc.,* 722 S.W.2d 621, 633 (Mo. App. E.D. 1986). Here, the grounds for the University's motion for directed verdict are:

1. Defendants are entitled to directed verdict on Count I, Plaintiff's "Wrongful Discharge" claim.

   a. Missouri does not recognize a "wrongful discharge" claim based on breach of contract.

   b. The university is entitled to sovereign immunity from plaintiff's wrongful discharge claim.

   c. Plaintiff failed to make a submissible breach of contract claim.

Each of these grounds was accompanied by detailed explanations by using specific facts from the evidence presented and the arguments of counsel. Specifically, the University's motion recited the fact, established by undisputed evidence at trial, that Ms. Reed was an at-will employee. In addition, it included the relevant portions of HR-520. The University, in both its written motion and oral argument, explained why Ms. Reed could not establish the essential elements of a valid contract because of her status as an at-will employee and the language of HR-520. Thus, because the motion provided grounds and facts specific to this case and because the motion was considered

14

together with arguments of counsel, it is clear that the motion was sufficient under rule 72.01(a). Point is denied.

## Count II

In relation to Count II, Ms. Reed asserts that the trial court erred in granting Drs. Giuliano and Pearces' motion for a directed verdict because she provided sufficient evidence to establish that they were acting outside of the interest of their employer and the scope of their employment by retaliating against Ms. Reed. She argues that the retaliation occurred when Drs. Giuliano and Pearce sought her dismissal after she reported them for violating University and college policy and rules. We disagree.

In Count II, Ms. Reed alleges that Drs. Giuliano and Pearce tortuously interfered with her business expectancy as an act of retaliation after she complained that they were using University equipment to perform off-site CERF exams.

> A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct.

*Cmty. Title Co. v Roosevelt Fed. Sav. & Loan Ass'n,* 796 S.W.2d 369, 372 (Mo. banc 1990) (citing *Fischer, etc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo. banc 1979). "Where the individual being sued is an officer or agent of the defendant corporation, the officer or agent acting for the corporation is the corporation for purposes of tortious interference." *Zipper, D.O., v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. App. W.D. 1998).

15

The trial court stated the following in granting Respondent's motion for directed verdict:

> "And the *Farrow* case indicates—there was no facts alleged supporting lack of justification that as the supervisor he had a legal right to criticize work performance and is the hospital's agent and not a third party. Summary judgment was properly granted. So I'll show the motion is sustained as to Count II of Plaintiff's Second Amended Petition.

The main authority in dispute on this count is *Farrow v. Saint Francis Medical Center,* 407 S.W.3d 579 (Mo. banc 2013). In *Farrow*, the plaintiff alleged that her supervisor interfered with her employment-related business expectancies by retaliating against her for rebuffing his sexual advances. *Id.* at 585-86. Specifically, she accused her supervisor of intimidating and harassing her and making defamatory comments about her performance. *Id.* The court, however, held that her supervisor had a right to criticize her work performance and that the plaintiff could not assert a successful claim because "while acting as [plaintiff's] supervisor, he was the [employer's] agent, not a third party. *Id.* at 603.

Similar to *Farrow*, Ms. Reed claims that Drs. Giuliano and Pearce interfered with her employment in retaliation for complaining about misconduct by providing unwarranted criticisms of her work performance, creating a hostile work environment, and engaging in efforts to get her fired. At trial, ample evidence was presented to determine Drs. Giuliano and Pearce were Ms. Reed's supervisors.[6] In this role Drs. Giuliano and Pearce were employed by the University, directed Ms. Reed's work, and

---

[6] Ms. Reed's second amended petition for damages states: "14. At all relevant times hereto, Defendants Giuliano and Pearce, as supervisors of Plaintiff or as persons directly acting in the interest of their employer, Defendant University, were Plaintiff's "employer," for purposes of Plaintiff's MHRA action."

16

performed her evaluations.  Thus, under *Farrow*, Drs. Giuliano and Pearce had a legal right to criticize Ms. Reed's work.  *Farrow*, 407 S.W.3d at 602.

Ms. Reed attempts to distinguish *Farrow*, alleging that "[t]here was no allegation in *Farrow* that the doctor being sued had misrepresented Farrow's work performance; merely that he had criticized it."  In *Farrow*, however, the plaintiff "contend[ed] Doctor made defamatory statements about the quality of her work" and "made several false statements about her job performance." *Farrow*, 407 S.W.3d at 585, 602.  Ms. Reed also attempts to distinguish the case by highlighting that Drs. Giuliano and Pearce met with the VHC administrator to express that they wanted her fired.  This too, however, is similar to *Farrow*, in which the supervisor allegedly told the plaintiff that he was "still going to get her out." *Farrow*, 407 S.W.3d at 586.  Ms. Reed also attempted to distinguish from *Farrow* by stating that Drs. Giuliano and Pearce were not her supervisors because they did not have the authority to discipline or terminate her.[7]  But in *Farrow*, the plaintiff did not allege that the supervisor disciplined or terminated her. Instead, these actions were performed by others.  *See* 407 S.W.3d at 585-86.  Finally, Ms. Reed asserts that the nature of Drs. Giuliano and Pearces' actions implies that they could not have acted "for" the University. In *Farrow*, however, the supervising doctor under scrutiny had allegedly retaliated against the plaintiff for rejecting his sexual advances, an action that would violate federal and state discrimination laws.  *See* 407 S.W. 3d 585-86. *Farrow* is indistinguishable from this case in relation to the material elements and is therefore controlling.

---

[7] This allegation, however, is contradicted by Ms. Reed's second amended petition for damages where she states that Dr. Pearce issued her a verbal warning and placed her on probation and issued her a written warning.

17

As stated in *Farrow*, "an action for tortious interference with a business expectancy will lie against a third party only. Where the individual being sued is an officer or agent of the defendant corporation, the officer or agent acting for the corporation is the corporation for purposes of tortious interference." 407 S.W.3d at 602 (quoting *Zipper v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. App. W.D. 1998)). Therefore, as in *Farrow*, because Drs. Giuliano and Pearce were Ms. Reed's supervisors and not a third party, Ms. Reed's claim against them for tortious interference with business expectancy fails.[8] Whether Ms. Reed can establish the remaining elements of a tortious interference claim is irrelevant because of the doctors' status as Ms. Reed's supervisors. *See* Farrow, 407 S.W.3d at 602-03; *Zipper,* 978 S.W.2d at 419.

**Conclusion**

Due to the at-will nature of Ms. Reed's employment and the legally unenforceable nature of employee handbooks and policies, Ms. Reed's wrongful discharge claim does not qualify as a breach of contract and is instead one sounding in tort. Because the claim alleged in Count I was a tort, the University, as a government body, has sovereign immunity. In addition, the language of the motion for directed

---

[8] Further, as an at-will employee, Ms. Reed does not have a valid contract or business expectancy that Drs. Giuliano and Pearce could interfere with, without justification. Under the at-will employment doctrine, an at-will employee may only challenge the reasons for her termination by proving the existence of a valid contract, the violation of a statutory provision, or a claim under the public policy exception. *See Margiotta,* 315 S.W.3d at 346. If Ms. Reed were allowed to maintain a tortious interference claim against Drs. Giuliano and Pearce as her supervisors, she would have a claim for wrongful termination without a valid employment contract, statutory violation, or public policy claim and, thus, would create a new exception to the at-will employment doctrine. Ms. Reed contends that "*Farrow*…cannot stand for a proposition that any person in a supervisory position…can violate statutory or public employer's rules and regulations and use improper means to retaliate against the employee who exposes their misdeed on the grounds that the 'supervisor' is acting in the employer's interest." *Farrow* does not hold that supervisors may retaliate against subordinates in this fashion; instead it recognizes that the employee may have a claim under the "public policy" exception. *See* 407 S.W.3d at 595-98. The decision also does not preclude an employee from holding its supervisor liable under another actionable tort theory. *See id.* at 598-600. Ms. Reed, however, did not make any of these claims.

18

verdict contained grounds and facts specific to the case and is therefore sufficient under Rule 72.01(a).  Finally, because Drs. Giuliano and Pearce were Ms. Reed's supervisors, a claim of tortious interference cannot lie. We affirm.

/s/ THOMAS H. NEWTON
Thomas H. Newton, Presiding Judge

Martin and Ardini, JJ. concur.